JOHN B. HEBERT *et al.*, Appellants, *v.* FRANCIS
                    LAVALLE, Appellee.

### APPEAL FROM ST. CLAIR.

The United States has, by grant, confirmed to the inhabitants of the village of
Cahokia the use of the "commons" adjacent to the village.  The parishioners
not living in the village, worshipping at the church in the village, do not, of
right, participate in the use of those "commons."

Parties deriving title from original inhabitants of the village of Cahokia, do not
enjoy rights of common which might have pertained to their grantors, if the
grantees have abandoned the village.  The "commons" were made appurte-
nant to village lots, not to lands remote from the village.

Occupants of the common field lands, not inhabitants of the village of Cahokia,
cannot vote for the supervisor authorized to survey parts of the "commons"
into lots and lease the same, nor for the trustees of schools, under authority
of the act of 1841.

A stranger cannot question the acts of "commoners" amongst themselves, even
though they should enclose the "commons."

THE opinion of the Court, by Mr. Justice BREESE, gives a
full statement, of the case.   The cause was heard in the
Second Grand Division, by agreement of parties.

G. KŒRNER, for Appellants.

JEHU BAKER, and N. NILES, for Appellee.

BREESE, J.   The complainants filed their bill in chancery
for an injunction, in the St. Clair Circuit Court, to the March
term, 1860, (an injunction having been granted by the judge
in vacation,) alleging, that the complainants were all citizens
of St. Clair county, and residents of the Cahokia *common
field;* that by certain ancient grants under the French and
English Colonial Government, confirmed by acts of Congress
under the Confederation, and under the present Constitution,
and by the Constitution of the State of Illinois of 1818, and
various Acts of the General Assembly of Illinois, the inhab-
itants of the village of Cahokia have enjoyed the right of pas-
turage, estovers, etc., etc., in common, in a certain tract of
land, known from time immemorial as the *Cahokia Commons.*
That by the same grants and confirmations, there was allotted
to each head of family, of said village, a certain tract for cul-
tivation, all of which tracts were enclosed under one common
fence, and are known as the *Cahokia Common field.*   That
the grants were contemporaneous grants with the grant of lots
to certain families then living in the settlement known as Ca-

hokia, or Coes or Cahokia village, the village not being then laid out, surveyed and defined.    That what is now known as Cahokia village, was surveyed and platted as late as 1808. That the village with attendant common field, which extended from Cahokia creek, to the Bluffs, east of the Mississippi river, was on the south, north and east surrounded by said commons, which commons were to support the cultivated fields of the inhabitants.    That in the course of time, many of the inhabitants of the village of Cahokia, who had resided within the territory of what is now known as Cahokia village, and near there, removed into the common field, for the purpose of better cultivating their respective allotments, and that in the course of time, a majority of families who had resided in the village, and their successors, (the grants being to the inhabitants and their successors,) had removed on to the common fields.    Complainants allege, that they hold their lands in the common field by titles of the original inhabitants, and that all *inhabitants of the common field are equally entitled to the enjoyment of the commons, in the use thereof*, and whatever proceeds may be derived therefrom, and that they have so claimed, from time immemorial.

That the General Assembly of Illinois, passed an act, 17th February, 1841, providing, that the commons, or any part thereof, might be surveyed in lots, and leased for any number of years not exceeding one hundred years; that the leases should be publicly sold after notice, and that the proceeds arising from the sales, should be appropriated to the education of the children of the inhabitants of the village of Cahokia; that by virtue of that act a portion of said commons was surveyed, platted and leased, the balance thereof, being about —— acres, remaining undisposed of; that by a subsequent act, 18th February, 1857, it was further provided, that the lots, laid out on the commons, might be leased at private sale, provided they should not be leased for a less price or sum per acre, than the average price at which the other parts of the commons were then leased.

Complainants, claiming as aforesaid, allege that they are informed and believe, that one Francis Lavalle, at present supervisor of the inhabitants of the village of Cahokia, has caused the balance, or part of the commons heretofore unsurveyed, to be surveyed, and at the instigation of, and by collusion with, certain inhabitants of the village, has already leased certain lots of said Cahokia commons at private sale, at mere nominal rates, and without reference to said average price, and is about to proceed to lease at private sale other of said lots collusively and fraudulently for a large number of

years, usually ninety-nine years, to the very great detriment of all persons interested in the commons. That complainants are informed, that he has already made arrangements, with certain inhabitants of the village, who wrongfully claim the sole and entire use of the commons, and the proceeds thereof, to distribute the leases of the newly surveyed lots amongst them, at their choice, and at merely nominal rates, in a private manner, claiming, that under the last act of the legislature, no publicity whatever is necessary. Complainants allege, that by such a disposition of their valuable estate, their rights will irretrievably be prejudiced, as such leases may be assigned to innocent purchasers, and that the title of the lots may be clouded, by leases given, even to participants in the fraud. That Lavalle refuses to account to complainants for his actings and doings and to give an account of the proceeds of the leases made by his predecessors and himself, contending, that complainants have no part or interest in the commons—that the law contemplates public leases, and private leases only in case of forfeiture, etc., etc. That the supervisor is a trustee for all who are entitled to a share in the commons, and that he is abusing his trust.

Complainants prayed an injunction restraining supervisor to lease illegally, and from applying the proceeds to the exclusive use of the few persons residing in Cahokia, and that the defendant render an account, etc., etc.

The defendant filed a general demurrer. The court sustained the demurrer, dissolved the injunction, and dismissed the bill, and from this decision the complainants take this appeal.

The only error assigned, is the decision of the court below, in sustaining the demurrer, dissolving the injunction, and dismissing the bill.

A slight glance at the early history of this State, may throw some light upon the question presented by this record, one new to our courts, and with no aid to be derived from adjudicated cases.

Anterior to the voyage of the Jesuit Priest, Father James Marquette, with the Sieur Joliet, in the summer of 1673, prosecuted under the auspices of Mons. Talon, the Intendant of New France, as Canada was called, and then under the crown of France, but little, if any, authentic information existed, of the river Mississippi. The Jesuit Father, with his companions, proceeding from Canada, by way of Green Bay and the Wisconsin river, entered the Mississippi, on the tenth of June, 1673, and explored it to the mouth of the Arkansas, and returned, by way of the Illinois river, in September of

that year.   This was an exploration undertaken by the French Government, to be conducted on a larger scale subsequently, when, in 1678, Robert Cavalier De LaSalle obtained letters patent from Louis XIV, dated 12th of May of that year.   By this patent, LaSalle was permitted " to endeavor to discover the western part of New France," the king having at heart this discovery, "through which, it was probable, a road might be found to penetrate to Mexico."   LaSalle was permitted to construct forts wherever necessary, and to hold them on the same terms as he held Fort Frontenac under his patent of March 13, 1675.   Acting under this patent of 1678, LaSalle, with a small party, reached, by way of the Illinois river, on the ninth of April, 1682, the mouth of the Mississippi, and took formal possession of it, and of the country watered by the river, in the name of Louis XIV, and in his honor, called the country Louisiana.

In virtue of the authority, under his letters patent, LaSalle constructed Fort St. Louis, at the " Starved Rock," on the Illinois river, and other forts on the lakes, and Mississippi river.   He seemed to have entire control of this portion of Louisiana, establishing his government at the Fort St. Louis, where it remained until sixteen hundred and ninety.

In the meantime, Jesuit missionaries advanced into the country, from the Seminary of Quebec, one of whom, James Gravier, as early as 1695, established the village of " our Lady of Kaskaskias," and then officiated at the altar, for several years, in the midst of populous tribes of Indians, laboring to convert them to christianity.

In the month of July, 1698, the Bishop of Quebec granted letters patent to the directors and superiors of the Seminary of Foreign Missions there, for the establishment of a mission for the Tamarois and Kahokias "living between the Illinois and Arancies," their country being considered as the key and passage to more distant tribes.   They were empowered to send their missionaries there, and " to make such residences, and erect such missions as they might judge proper."

In pursuance of this authority, " the Mission of St. Sulpice" was established among the Tamarois and Kahokia Indians, and a village grew up, called " the village of the Holy Family of Cooquias," populated by Indians, fur traders, and tillers of the soil, all within the shadow of the Church of the Mission. This church was the nucleus of the village, the ground necessary for it, and land for the use of the villagers, being readily granted by the native owners.

From the time LaSalle took possession of the country in 1682, we discover no trace of a control by the crown of France,

over it, until the grant to Anthony Crozat, by letters patent under date of September 14, 1712, of the whole commerce of the country, then for the first time, officially, called Louisiana. The Jesuit missionaries appear, up to this period, to have exercised all the control, necessary, over its people, subject to no power other than their superiors of the Seminary of Quebec.

Crozat made efforts to develop the lead mines of Missouri, and imported many laborers and others, to the several missions on the Mississippi river, but failing to find the precious metals in which it was thought this country abounded, he, in 1717, surrendered his patent to the then occupant of the throne, the infant king, Louis XV, who ruled France, under the regency of the Duke of Orleans. He, in conjunction with the celebrated Law, established " the Company of the West," or " Company of the Indies," to whom was granted all Louisiana, with power, in conjunction with an officer of the crown, to grant away the royal domain. The early records of this State, preserved in the French language, are full of grants made by this company, up to 1732, when it was dissolved, and its powers and privileges reverted to the crown.

Among these records, is to be found a grant substantially as follows:

We, Pierre Duguet de Boisbriant, Knight of the Military Order of St. Louis, and First Lieutenant of the King in the Province of Louisiana, Commandant in the Illinois; and Marc Antonia de la Loire Des Ursins, Principal Commissary of the Royal Company of the Indies:

On the demand of the missionaries of the Caokias and Tamarois, to grant to them a tract of four leagues square in fee simple, with the neighboring island, to be taken a quarter of a league above the small river of Caokias, situated above the Indian village, and in going up following the course of the Mississippi, and in returning towards the Fort of Chartres, running in depth to the north, east and south for quantity. We in consequence of our powers have granted the said land to the Missionaries of Caokias and Tamarois, in fee simple, over which, they can, from the present, work, clear and plant the land, awaiting a formal concession which will be sent from France by the directors general of the Royal Company of the Indies. At the Fort of Chartres, this 22nd June, A. D. 1722. Signed Boisbriant—Des Ursins.

On this grant, documentary evidence presented by counsel in the argument of the case shows, that a village was established and village lots granted. On the explosion of " the Company of the West," on the 10th of April, 1732, their

powers and privileges reverted to the crown, from which emanated, thereafter, all grants of land. In August, 1743, this grant made in 1722, was recognized by the French Government, acting through Mons. Vaudrieul, then Governor, and Jalmon, Commissary, of the Province of Louisiana.

It will be perceived, there are no words in this grant, designating the land granted, or any portion of it, as commons—nor does it appear for what special use it was granted, but generally, for the use of the mission there established. Upon it the missionaries established their church and village—granted portions of it for cultivation, whilst the largest portion was suffered to remain for the common use of the inhabitants, for pasturage, wood, and other purposes. It is a peculiarity attending the early French settlements here, that the tillers of the soil did not reside upon their cultivated lands, but in the village. There were their barns and stables and out-lots for the protection of their cattle, and appurtenant to it was the common, on which their animals could range and feed. The tillable land was granted in narrow strips, usually about one arpent in width, and in depth for quantity, some of which arpents were situate more than four miles from the village, going north.

After the conquest of the country by England, the result of the war commenced in 1756, and terminated by the treaty of Paris of 1763, no interference was attempted with any of the grants made by the India Company, or by the crown of France, in this part of Louisiana, nor by Virginia, after its conquest by her arms, in 1778. Virginia ceded the country to the United States, by deed dated March 1, 1784, by authority of an act for that purpose, passed October 20, 1783. That act provides, " that the French and Canadian inhabitants, and other settlers of the Kaskaskias, Saint Vincents and the neighboring villages, who have professed themselves citizens of Virginia, shall have their possessions and titles confirmed to them, and be protected in the enjoyment of their rights and liberties." (Scates' Comp. 19.) On the 29th August, 1788, the Congress of the Confederation adopted a resolution, instructing the Governor of the Western Territory, to proceed without delay to the French settlements on the river Mississippi, and to examine the titles and possessions of those settlers, " in which they are to be confirmed." Hence originated a class of titles known in this State as " a Governor's confirmation," a specimen of which is found in the case of *Doe ex dem., etc.,* v. *Hill,* Breese, 236, new edition, 304.

On the 3rd of March, 1791, the Congress of the United States passed an act for granting lands to the inhabitants and

settlers at Vincennes and the Illinois country, in the territory north-west of the Ohio, and for confirming them in their possession, the fifth section of which provides, "that a tract of land containing about five thousand four hundred acres, which for many years has been fenced and used by the inhabitants of Vincennes as a common, also a tract of land including the villages of Cohos and Prairie du Pont, and heretofore used by the inhabitants of the said villages as a common, be, and the same are hereby appropriated to the use of the inhabitants of Vincennes, and of the said villages respectively, to be used by them as a common, until otherwise disposed of by law." Laws of U. S., vol. 1, page 221.

Here is the first recognition, by the act of any government, of a right of any of the inhabitants of the village of Cahokia, to land as commons. Subsequently, commissioners were appointed by an act of Congress, to examine into this, among other claims to land in Illinois, and they examined, and confirmed this claim as a common to the inhabitants of Cahokia, on the 21st December, 1809, and so reported to the Congress, and Congress, on the 1st of May, 1810, passed an act, that all the decisions made by these commissioners entered in their transcript, bearing date December 31, 1809, and transmitted to the Secretary of the Treasury, be confirmed. 2nd vol. Laws of U. S., page 607.

This act is an operative grant of all the interest the United States may, at any time, have had in the land described in the transcript of the commissioners under that date, and confirms the land in terms, to the inhabitants of these "villages," respectively. Now it cannot be material to inquire, to what uses these lands were originally appropriated by the Priests of the Mission; the government, having power to confirm the title to them, or to grant them, having restricted the grant to the inhabitants of those villages as a common.

But it is argued, that the term village must not have the restricted signification which modern ideas of a village would place upon it, but that it may well be understood to mean " the settlement" or the parish, and in that sense it was understood by the missionaries themselves, as their letters on the subject referred to in the argument tend to show.

We do not understand, from anything in those letters, or from any facts in the case brought to our notice, that the parishioners—those who worshipped at the village church, and were under the spiritual control of its priest, and not living in the village, possessed any village rights belonging to the villagers. A parish is understood to be, the territorial jurisdiction of a secular priest, or a precinct, the inhabitants

of which belong to the same church, or they may reside promiscuously, among people belonging to any' church, and be resident in several villages. A village is any small assemblage of houses occupied by artisans, laboring people and farmers—in French villages, always by farmers. It is a defined locality with a name, and its inhabitants are called villagers. We have no right to suppose, that Congress, in making this grant to the inhabitants of the village of Cahokia, designed to include persons who resided on, and occupied lands, miles remote from the village, though the fact might be, that they worshipped at the parish church, and were under the spiritual teaching of the village priest. The term "inhabitants of the village," having a defined and well understood meaning, we do not see how it can be made, by any reasonable construction, to embrace other persons who are not, by their own showing, inhabitants of the village.

It is also argued by the complainants' counsel, that inasmuch as the complainants' derive their titles to the lands in the common field, from original inhabitants of the village of Cahokia, they should have all the rights which, at any time, might have pertained to their grantors. This would be true undoubtedly, had they remained inhabitants of the village, and they would have been their " successors," in contemplation of the act of 1819. Laws of 1819, page 122. A removal from the village, by occupying their individual allotments in the common field remote from the village, was an abandonment of their village rights, for it is only to inhabitants of the village that a right of common has been granted. It was to them as inhabitants of the village, the right was granted, and we cannot see the justice of a claim which shall accord to those who have abandoned the village, rights equal to those who remain in it, as inhabitants of it. The act of Congress cited, appropriates this land as a common, to the inhabitants of the village—not to those who might own lands in the common field, and reside upon them. It was made appurtenant to the village lots, and not to arable lands remote from the village for which there were individual and exclusive grants.

It certainly could not have been in the contemplation of Congress, in conferring or granting these lands as a common, to the inhabitants of the village, that by any construction, a class of settlers living separate and apart as farmers on their own lands, should claim, or desire even the benefit of the commons. The object of the grant of commons to the inhabitants o fthe village, was, evidently to afford them such estovers, pasturage, etc., as they could not otherwise possess and enjoy, villagers being confined to small lots for dwellings, and the

necessary out-houses. The domain of the proprietor of a farm is supposed to embrace within it, all these essentials to a comfortable subsistence, he being the exclusive owner of all he occupies. No necessity would seem to exist for such a convenience, and therefore is it, that the grant was made " to the inhabitants of the village" exclusively. In adverting to the legislation of our own State in reference to the commons, it will be found to be in harmony with the view we have taken of the question.

It is provided by section eight of article eight, of the constitution of 1818, that all lands which have been granted as a common, to the inhabitants of any town, hamlet, village, or corporation, shall forever remain common to the inhabitants of such town, hamlet, village or corporation. (Scates' Comp. 54.)

Substantially the same provision is found in the constitution of 1848, article eleven. (Ib. 72.)

A restriction to the inhabitants of the village, pervades all our legislation on the subject. Laws of 1819, page 122.

By the act of February 17, 1841, (Session Laws, pp. 65, 66,) it is provided that the supervisor elected by the inhabitants of the village of Cahokia, is authorized to cause to be surveyed in lots, etc., any part of the commons of Cahokia, and lease the same, etc. It is a pertinent inquiry here, can the occupiers of the common field lands, not being inhabitants of the village, but residing out of it on their individual lands, vote at the election of this officer, or vote for the trustees of schools as provided in the fourth section ? Was such a claim ever advanced ? We think this inquiry, answered, 'as it must be, in the negative, goes far to dispose of the case. They cannot vote for a supervisor of the commons, because they are not inhabitants of the village, nor, for the same reason, can they enjoy the benefit of the proceeds of the common to be derived from the leases; they are isolated from it by their residence.

The principle is well settled that a stranger cannot question the acts of commoners among themselves, no matter how subversive they may be of the objects of the grant, even if extending to an actual enclosing of the commons. And the complainants here being strangers, not inhabitants of the village, cannot be allowed to interfere with the acts of the commoners of which complaint is made. The demurrer goes to the very substance of the bill, and was properly sustained. The decree is affirmed.

*Decree affirmed.*