| 167 | 23 |
| 181 | 437 |

PRESIDENT AND TRUSTEES OF COMMONS OF KASKASKIA

*v.*

WILLIAM McCLURE.

*Filed at Mt. Vernon May 10, 1897.*

1. RIPARIAN RIGHTS—*rights of riparian owners are the same under the civil and common law.*  The rule that islands formed in a river, by the changing of its channel or otherwise, belong to riparian owners of lands having the river for their natural boundary, is the same under the civil and the common law.

2. SAME—*the Custom of Paris gave to riparian owners islands formed in the river.*  The *Custom of Paris*, established as the law of the territory of Louisiana, including Illinois, by the royal edict of France in the year 1712, gave to riparian owners the islands formed in the river constituting the natural boundary of their lands.

3. SAME—*inhabitants of Kaskaskia are entitled, as riparian owners, to islands formed in the Mississippi.*  By both the early French grants to the inhabitants of the parish of Kaskaskia, as confirmed by Gov. Vaudreuil of Louisiana in 1743, and the action of the United States, which subsequently acquired the territory from Virginia, the inhabitants of Kaskaskia, as riparian owners of the Kaskaskia Commons, are entitled to islands forming in the Mississippi river within the latitudinal limits of such commons.

4. COMMONS OF KASKASKIA—*act of 1851 did not vest title to Kaskaskia commons in corporate body thereby created.*  The act of 1851, passed under authority of the constitution of 1848, which created the corporate body known as "The President and Trustees of the Commons of Kaskaskia," did not vest the title to the land in such body, but merely clothed it with power to execute a portion of the trust held by the State in favor of the inhabitants of Kaskaskia.

5. SAME—*cannot be alienated in fee.*  Neither the inhabitants of Kaskaskia nor "The President and Trustees of the Commons of Kaskaskia" have power to transfer a greater interest in any part of the Kaskaskia commons than a lease for a term of fifty years.

6. LIMITATIONS—*the Statute of Limitations does not run against the State in any capacity.*  The Statute of Limitations does not run against the State in respect to property the title to which is held by the State in trust for a portion of the public.

7. SAME—*title to islands being part of the Kaskaskia commons cannot be acquired by adverse possession.*  Title to islands in the Mississippi river which are part of the Kaskaskia commons cannot be acquired against the inhabitants of Kaskaskia or "The President and Trustees of the Commons of Kaskaskia," who represent the State, under the Statute of Limitations, by adverse possession.

WRIT OF ERROR to the Circuit Court of Randolph county; the Hon. GEORGE W. WALL, Judge, presiding.

This was an action of ejectment to recover, as a part of the commons belonging to the inhabitants of Kaskaskia, a portion of an island in the Mississippi river called Brewer's or McClure's Island. Plaintiffs claimed title under an old French grant of which no known record exists, but which, in 1743, was confirmed to them by grant or patent by Vaudreuil, then the French Governor of the province of Louisiana. This patent, as shown by the record, was as follows:

"Pierre de Rigault de Vaudreuil, Governor, and Edme Gatien Salmon, Commissary Orderer, of the province of Louisiana.—Seen the petition to us presented on the 16th day of June of this present year by the inhabitants of the parish of the Immaculate Conception of Kaskaskia, dependence of the Illinois, tending to be confirmed in the possession of a common which they have had a long time for the pasturage of their cattle, in the point called *le pointe de bois*, which runs to the entrance of the river Kaskaskia. We, by virtue of the power to us granted by his Majesty, have confirmed and do confirm to the said inhabitants the possession of the said common on the following conditions:

"*First*—That the concessions heretofore granted, either by the India Company, either by our predecessors, or by us, in the prairie of Kaskaskia on the side of the point which runs to the entrance of the river, shall terminate at the land granted to a man named Cavalier, and in consequence that all concessions that may have been made on the said point, from the land of the said Cavalier forward, on the side of the entrance of the said river, shall be null, void and no effect; in consequence of which the said point, as it is above designated, shall remain in common without altering its nature, nevertheless reserving to us the power, whenever the case may require it, of

granting the said commons to the inhabitants established and who may establish, and this on the representations which may be made to us by the commandants and sub-delegates on the said places.

"*Secondly*—On the road vulgarly called at the square line, between the large and small line, shall be rendered practicable and maintained for the passage of the carts and cattle going into the common,—and this by each of the proprietors, as well of the great as of the small line, whose lands border on the roads of the square line. And as to the fences which ought to run along the side of the village from said road of the square line unto the river, as also the one on the side of the point running to the Mississippi and to the Kaskaskia river, they shall be made and maintained at the expense of the community, to the end that the cultivated lands be not injured by the cattle.

"*Thirdly*—To facilitate to the inhabitants the means of making their autumnal harvest and preventing its being damaged by the cattle, we forbid all persons to leave their cattle range upon cultivated lands. They are, notwithstanding, permitted to graze upon their own proper lands on having them diligently watched.

"*Fourthly*—Willing that the wood which is on the land granted belong to the proprietors of the said land, we forbid all persons to cut down any elsewhere than on their own lands; and as to the wood which may be found in the commons, it will be allowed to each of them having a right to the said commons, to cut down for their own use either for building or firewood. And shall be the present regulation read, published and affixed, to the end that no person may be ignorant thereof.

"Given at New Orleans, the 14th day of August, 1743.

VAUDREUIL,<br>SALMON."

This grant was recorded in book "A," pages 343 and 344, in the Auditor's office, Illinois. All facts necessary to an understanding of the case are stated in the opinion.

WILLIAM HARTZELL, and R. E. SPRIGG, for plaintiffs in error:

The acceptance of the deed of cession from Virginia imposed upon the United States the duty of performing the conditions stipulated, and also to protect the inhabitants in the enjoyment of their property rights. *Langdeau* v. *Hanes*, 21 Wall. 521.

The act of Congress confirming the titles and claims of certain towns and villages to village lots and commons is paramount to a title held under an old Spanish concession confirmed later. *Chouteau* v. *Eckart*, 2 How. 344.

Whatever claim or interest there was in the United States passed out by the confirmation act of May 1, 1810, in the lands therein mentioned. *Doe* v. *Hill*, Breese, 304.

A survey approved by the United States and accepted by the confirmee is conclusive evidence that the land granted is the same described and bounded by the survey. *Guitard* v. *Stoddard*, 16 How. 494.

A grant by Congress is as binding as a patent, and a confirmation by law is to all intents and purposes a grant. *Strother* v. *Lucas*, 12 Pet. 410; *Gerrett* v. *Taylor*, 9 Cranch, 43.

A survey and confirmation of the commons by the United States are binding upon them and against all those claiming adversely. *Dent* v. *Emmeger*, 14 Wall. 308.

Cities and towns, as well as individuals, whose lands are bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. *New Orleans* v. *United States*, 10 Pet. 662.

Grants of land bounded by fresh-water rivers, where the expressions designating the water line are general, confer the proprietorship on the grantee to the middle thread of the stream, and entitle him to the accretions. *Jones* v. *Soulard*, 24 How. 41.

The civil law says that ground gained on a river by alluvion or imperceptible increase belongs to the owner of the adjoining land *jure gentium.* This is also the rule

of the common law. 3 Kent's Com. 428, notes *b* and *a; Municipality No. 2* v. *Orleans Cotton Press*, 18 La. 122.

If a fresh-water river running between the lands of separate owners insensibly gains on one side or the other, the title of each continues to go *ad filum medium aquæ.* 3 Kent's Com. 428.

The boundary line between the States of Illinois and Missouri is the middle of the main channel of the river. If there are several channels, the middle of the principal one is the boundary. *Buttenuth* v. *Bridge Co.* 123 Ill. 545.

If the Mississippi river forms the boundary line of land granted by the United States, the grantee becomes a riparian owner both by the common and the civil law, and his grant extends to the center of the current. *Houck* v. *Yates*, 82 Ill. 179.

All alluvions belong to the riparian proprietor, both by the common and civil law. All grants bounded upon a river not navigable by the common law entitle the grantee to all islands lying between the main land and the center of the stream. *Middleton* v. *Pritchard*, 3 Scam. 520; *Fuller* v. *Dauphin*, 124 Ill. 542; *Chicago* v. *Laflin*, 49 id. 176; *Brown* v. *Bressler*, 64 id. 488.

H. CLAY HORNER, and T. B. WHITLEDGE, for defendant in error:

Every grant of land must be governed by the law in force in the country at the date of the grant. *O'Fallon* v. *Daggett*, 4 Mo. 346; *Morgan* v. *Reading*, 3 S. & M. 404; *Canal Appraisers* v. *People*, 17 Wend. 588.

The law of *las siete partidas*, cited by counsel, is the code of Spain promulgated in 1343, and was not in force in Louisiana until 1769,—a quarter of a century after our grant in 1743. Moreau & Carleton's preface to *Las Siete Partidas*, 18-23; *Canal Appraisers* v. *People*, 17 Wend. 588.

The ancient French law in force in 1743 gave the riparian owner to the water's edge, but excluded all islands in the river. *Canal Appraisers* v. *People*, 17 Wend.

592; Mackenzie on Roman Law, 178; Livingston's article, 2 Am. State Papers, 39.

The confirmation of this grant by the United States government simply admitted its validity and added nothing to its force. *Langdeau* v. *Hanes,* 21 Wall. 521; *Reichart* v. *Felps,* 33 Ill. 433.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was an action of ejectment brought by the plaintiffs in error, to recover from the defendant in error the following lands in Randolph county, to-wit: The east half of out-lot 1 of the commons of Kaskaskia, lying south of third and fourth surveys of said commons, containing two hundred acres, being part of an island in the Mississippi river. The case was tried before the court without a jury, and judgment was rendered for the defendant. Plaintiffs bring the cause to this court by writ of error.

It is in the first place contended by defendant in error that the land in controversy is not in the State of Illinois. Capt. W. C. Postal, an old river pilot, testified that since 1847, when he first knew of this part of the river, the channel ran down the Missouri shore; that this island (McClure's) was on the east side,—the Illinois side. Newman K. Dobbs, who has resided at Kaskaskia Point for sixty-two years, testified that the main channel was next to the Missouri shore. William R. Burch has resided in the neighborhood since 1847, and testified that the main channel ran on the Missouri side, although there had been at one time a channel on both sides. Fred Easters testified that he was eighty-three years of age, and was born and had always lived in Perry county, Missouri, within two miles of the island in controversy; that the island commenced to form by reason of a boat sinking near the Missouri shore, about 1851 or 1852; that the channel used to be on the east side, but by reason of the caving of the banks it shifted to the west side. Several

deeds purporting to convey portions of the island in controversy were introduced in evidence by the defendant, in all of which it is described as being situate in sections 32, 33 and 38, in township 7, south, range 7, in Randolph county, State of Illinois. We think the weight of the evidence is that it is in Illinois.

The title of plaintiffs in error had its origin in an old grant of the French government to the inhabitants of Kaskaskia. It is a matter of common historical knowledge that France claimed this portion of the Mississippi valley by right of discovery and occupation, LaSalle having, on the 9th of April, 1682, taken formal possession of the country watered by the Mississippi, in the name of Louis XIV, and in his honor called the country Louisiana. In 1673 Joliet and Marquette, on their return from their famous voyage of discovery, stopped at the principal town of the Illinois Indian confederacy, situated on the banks of the river Illinois, seven miles below the present town of Ottawa. It was then called Kaskaskia. Marquette returned to the village in 1675 and established the mission of the Immaculate Conception,—the oldest in Illinois. He called the religious society which he established, the "Mission of the Immaculate Conception," and the town, Kaskaskia. This curious Indian colony dispersed after the death of LaSalle, till few or no Indians were left except the Kaskaskias, a sub-tribe of the Illinois. James Gravier, a Jesuit missionary from Quebec, as early as 1700 established the village of "Our Lady of Kaskaskias" at the place where the present town of Kaskaskia now stands, the Indians having removed from the former site on the Illinois river to the latter, on the Kaskaskia, near the mouth of the little river which bears the same name. Charlevoix, who was here in 1721, calls this the oldest settlement of the Illinois, though there is reason to believe that the village of Cahokia is the older of the two. (See 1 Moses Illinois, Hist. and Stat. pp. 83-86, 267-269; 1 Parkman's Half Century of Conflict, pp. 316,

317; *Hebert* v. *Lavalle*, 27 Ill. 448.) The whole of Louisiana, including Illinois, was in 1712 granted to Anthony Crozat, his charter providing that the royal edicts and the *Coutume de Paris* should be the law of the colony. Crozat having surrendered his charter in 1717, the same country was ceded to the West India Company, and by the fifteenth article of the charter the *Custom of Paris* was established unchangeably as the fundamental law of the territory. The early records of this State, preserved in the French language, are full of grants made by this company, up to 1732, when it was dissolved, and its powers and privileges reverted to the crown.

The original grant to the village of Kaskaskia is not in the record, but Vaudreuil, the Governor, and Salmon, the *commissaire ordonnateur*, or intendant, by patent dated August 14, 1743, confirmed to the inhabitants of the parish of the Immaculate Conception of Kaskaskia, dependence of Illinois, the possession of a common which they had had a long time for the pasturage of their cattle, in the point called *la pointe de bois*, which runs to the entrance of the river Kaskaskia. (Pages 38 and 39 in volume of translation of French Records, in the Auditor's office at Springfield.) In 1763 this territory was ceded to England, and Virginia acquired it in 1778 by conquest of arms, and by deed of cession of March 1, 1784, ceded it to the United States, the said deed of cession containing the following provisions in regard to these lands: "That the French and Canadian inhabitants and other settlers of the Kaskaskias, St. Vincents and the neighboring villages, who have professed themselves citizens of Virginia, shall have their possessions and titles confirmed to them, and be protected in the enjoyment of their rights and liberties." (See a full history of the proceedings in regard to these French settlements in *Doe ex dem.* v. *Hill*, Beecher's Breese, 304, and in *Hebert* v. *Lavalle*, 27 Ill. 448.) Congress appointed commissioners to examine these French claims, and they reported, under date of Decem-

ber 31, 1809, that Gov. Vaudreuil had granted "to the inhabitants of Kaskaskia a tract of land as a common for the use of the said inhabitants, which seems to have been bounded north by the southern limit of the village, east by the Kaskaskia river, and south and west by the Mississippi and the limits of the common field, so called, which will be found laid down in the plat annexed." (2 Am. State Papers, Pub. Lands, 148.) Congress passed an act, approved May 1, 1810, "that all the decisions made by the commissioners appointed for the purpose of examining the claims of persons claiming lands in the district of Kaskaskia, in favor of such claimants, as entered in the transcript of decisions bearing date the 31st day of December, 1809, which have been transmitted by the said commissioners to the Secretary of the Treasury according to law, be and the same are hereby confirmed." (2 U. S. Stat. 607.) And by the act approved February 20, 1812: "The decisions made by the commissioners heretofore appointed for the purpose of examining the claims of persons to lands in the district of Kaskaskia, in favor of such claimants, to town or village lots, out-lots, or rights in common to commons and common fields, as entered in the transcript of decisions bearing date the 31st day of December, 1809, which have been transmitted by the said commissioners to the Secretary of the Treasury, according to law, be confirmed to all such rightful claimants according to their respective rights thereto." (2 U. S. Stat. 678.)

It is contended by defendant in error, that by the law in force in the Louisiana territory at the time the original grant, as well as at the time the grant of confirmation, was made to the inhabitants of the village of Kaskaskia, all islands that might be formed in the Mississippi river belonged to the king of France, and not to the owners of the lands upon the banks of the river, and that, aside from the question raised by the Statute of Limitations, the title to the island must be determined by the old

French law as it then stood before the adoption of the *Code Napoleon,* which, however, it is said, did not change the French law in the respect mentioned.

The law of France is but an adaptation of the old Roman or civil law. Chancellor WALWORTH, in *Canal Appraisers* v. *People,* 17 Wend. 596, says: "It is true, indeed, that by the civil law the *alveus* or bed of the stream did not pass to the owners upon its banks whose heritages had the river as a natural boundary while such bed was actually covered by the waters of the stream; but the moment the waters dried up, or the course of the river was changed, either wholly or in part, so as to render its bed susceptible of a beneficial use, the civil law gave the land which had originally formed a part of its channel to the heritors upon its banks, to the same extent that the common law now gives it to the riparian owner while it is covered by the water, without the power of using it in any manner inconsistent with the public right of navigation. By the settled rule of the civil law, if a river abandoned its former bed and formed a new one, or from any other cause ceased to flow in its old channel, the soil which was thus left permanently dry was no longer the property of the public, but it immediately became the private property of the owners on its former banks,—the owners on each side taking to the center of the original channel of the river. (Vattel's Law of Nat. 122, sec. 270; Dig. bk. 43, tit. 12, sec. 7; L. 7, sec. 6, *de acquir. dom.;* 1 Biret's Applic. 218; 2 Ersk. Inst. tit. 1, sec. 5, p. 196.) And, as we have before seen, the islands in the river belonged to the riparian owners who had the river for their natural boundary." That this was so by the civil law, see Cooper's Justinian, p. 74.

That the effect of the rule established by the civil and the common laws was the same as bearing upon the question here involved, has been repeatedly declared by the decisions of this court, and that not only the accretions made imperceptibly, but the islands formed to the thread

of the stream, became the property of the riparian pro-
prietor. *Houck* v. *Yates*, 82 Ill. 179; *Middleton* v. *Pritchard*,
3 Scam. 510; *Cobb* v. *Lavalle*, 89 Ill. 331; *Piper* v. *Connelly*,
108 id. 646; *Griffin* v. *Johnson*, 161 id. 377; *Rutz* v. *Kehn*, 143
id. 558; *Buttenuth* v. *St. Louis Bridge Co.* 123 id. 535.

But it is said that the civil law, strictly speaking,
was not in force in France or its dependencies at the
time the grant in question was made, but that, as herein-
before stated, the *Custom of Paris*, which was a modified
form of the civil law, had been established as the fun-
damental law of the Louisiana territory, and it is urged
that by the *Custom of Paris* all islands arising in rivers
were the property of the sovereign, and not of the own-
ers of the banks of the stream.

The common law (or customs) of France varied with
the different provinces, and it was not until the promul-
gation of the *Code Napoleon* that a uniform rule was es-
tablished for the whole country. By that code, islands
which may be formed in such navigable rivers belong to
the nation, if there be no title or prescription to the con-
trary. (Code, secs. 560, 561.) Chancellor WALWORTH, in
*Canal Appraisers* v. *People*, 17 Wend. 571, (already quoted,)
says on page 592: "By the French law, even before the
adoption of the Napoleon Code, islands which were
newly formed in the bed of a navigable river belonged
to the crown as the lord paramount, according to the
principles of the feudal system. It was not so, however,
by the Roman law." Pothier says: "By the French laws
the navigable rivers belong to the king. The islands
which are formed within, as well as the bed when it is
abandoned to take a new course, belong to the king.
The proprietors of inheritances on the bank cannot at
all pretend to it, unless they show titles of concession
from the king. "

But it has been claimed, notably by Edward Living-
ston, (2 Hall's Law Journal, 307,) that this was not the
general law of France, but an exception to that law in

particular provinces.    After Napoleon had prepared the draft of his celebrated code it was transmitted to the various provincial tribunals for inspection and suggestion before it was promulgated as law.    The tribunal of appeals of Rouen, in commenting on this portion of the code, made the following remarks: "The Roman law of the *Digest de acquirendo rerum dominio* gave to the adjoining proprietors the islands which were formed in the river,—a disposition which appears more equitable than this article of the code, and more worthy of a great nation whose true interest is not to acquire new property to the injury of individuals.    The edicts and declarations of the former kings, which claimed for the demesne the islands of navigable streams and rivers, were only exchequer laws.    These laws were founded on the false pretext that the islands were an appendage of the river, which was considered as belonging to the king.    (1) The river itself is not a national demesne, but a public thing. It belongs to the nation, not by a property title, but by sovereignty.    (2) The islands are not appendages to the waters of the river, but to the bed of the river, the rights of individuals to which are not denied when the river abandons it.    (3) An island cannot be formed without increasing the width of the river at the expense of the adjoining land, and the damages to which the proprietors of these lands are exposed should entitle them to the islands which are formed in the river, as an indemnity for the risks and losses they incur.    The principle which we propose would not at all invade the proprietary right to those islands which the nation possesses or for which it has positive titles, but it would tranquilize those individuals who for ages have possessed islands in the rivers as true owners, and whom the agents of the demesne have always vexed without having ever succeeded in despoiling them of their estates."

As to the *Custom of Paris* Ferriere says: "If the river should add to the inheritance of an individual an island

or an entire parcel of soil, although it should be united
to the inheritance, this would be considered as a part
of this inheritance, but not with the quality of separate
property." This seems to show that the *Custom of Paris*,
in conformity with the Roman law, gave to the owners
of land bounded by a river the islands and portions of
land formed therein. The *Custom of Paris* was by the
terms of the charter the law of Louisiana, and appar-
ently it was in accord with the Roman law, notwith-
standing the pretensions of the French kings to the
rivers and islands of France, which pretensions, how-
ever, became the law of the whole of that country by the
promulgation of the *Code Napoleon*. If this custom and
law were in accord with the civil law, as they seem to
have been, it is plain that by the grant, as confirmed by
Gov. Vaudreuil to the inhabitants of the parish of Kas-
kaskia, the inchoate right to this island was annexed to
the grant by the laws of the country.

Counsel have contented themselves with a limited
examination of this question, and, as we view the case,
further consideration of such question on our part than
we have here given it becomes unnecessary, for the rea-
son that, even if this island would, under the French law,
have become the property of the sovereign, all right or
title thereto after its cession to the United States was
relinquished to the inhabitants of Kaskaskia by the
necessary effect of the acts of Congress. The patent of
Gov. Vaudreuil, while containing certain reservations,
purports to confirm to the inhabitants of Kaskaskia
lands which had been granted to them by some former
grant, the terms of which are not shown by the record;
and by the cession of the territory in question by Vir-
ginia, the United States were required only to confirm
to the settlers their possessions and titles. Still, it is
manifest that as the United States by this cession ob-
tained all the lands, and title thereto, not previously
granted, it had the power, by fixing boundaries and

otherwise, to enlarge such possessions and titles which it had agreed to confirm. In the patent of Vaudreuil the grant of the lands to said inhabitants is called "a common which they have had a long time for the pasturage of their cattle, in the point called *la pointe de bois*, which runs to the entrance of the river Kaskaskia." The commissioners' decision and report, which were approved by Congress, stated that it "seems to have been bounded north by the southern limit of the village, east by the Kaskaskia river, and south and west by the Mississippi and the limits of the common field, so called, which will be found laid down in the plat annexed." An inspection of the plat shows that the village of Kaskaskia was situated in a bend of the Kaskaskia river, that the common fields (being the lands tilled by the villagers) extended from the village to the Mississippi river, being bounded by straight lines on the sides towards the Kaskaskia river and the Mississippi on the south, leaving a Y-shaped strip between both rivers, with the lower limb running to the confluence of the two rivers, for the commons. Portions of this common were surveyed and platted at different times, and the island in controversy lies chiefly along the river front of the fourth survey.

It is doubtless true, as a general proposition, that a confirmation does not enlarge the original grant. In *Reichart* v. *Felps*, 33 Ill. 433, it is said that the confirmation by Gov. St. Clair of the Northwest Territory "is a declaration by the United States that they had no claim to the land. It was not a grant by the United States, because the title was not in them." This doctrine was affirmed in *Reichart* v. *Felps*, 6 Wall. 160. (See, also, *Doe ex dem.* v. *Hill, supra.*) In *Hebert* v. *Lavalle, supra*, however, speaking of the act of Congress of May 1, 1810, *supra*, this court said (p. 454): "This act is an operative grant of all the interest the United States may, at any time, have had in the land described in the transcript of the commissioners under that date, and confirms the land, in terms, to

the inhabitants of these villages, respectively." And it was further said, that it was not "material to inquire to what uses the lands were originally appropriated by the priests of the mission, the government, having power to confirm the title to them or to grant them, having restricted the grant to the inhabitants of those villages as a common." So, too, in *Landow* v. *Hines*, 21 Wall. 521, while it was said by the Supreme Court of the United States in that case that "it was for confirmation of existing possessions and titles that the deed of cession stipulated, not the transfer of any new title," still the perfect title of all the lands embraced in the deed of cession, aside from the possessions and titles the confirmation of which was stipulated, was ceded by Virginia to the United States, so that the general government had not only the power to confirm these possessions and titles in the inhabitants of Kaskaskia, but it had full power, by establishing fixed boundaries or otherwise, to grant to these inhabitants the titles to lands which were not embraced within the original French grant. Thus, it was held in that case that the patent provided for in the act of Congress would have added nothing to the force of the confirmation made by the act of Congress itself, and it was said:  "A legislative confirmation of a claim to land is a recognition of the validity of such claim, and operates as effectually as a grant or quit-claim from the government.   *   *   *   If the claim be to land with defined boundaries or capable of identification, the legislative confirmation perfects the title to the particular tract, and a subsequent patent is only documentary evidence of that title.   If the claim be to quantity, and not to a specific tract capable of identification, a segregation by survey will be required, and the confirmation will then immediately attach the title to the land segregated."

It has been noticed that the boundaries to the lands of the original French grant in controversy, so far as anything in this record discloses, were uncertain and

indefinite, and it cannot be said that they were made certain and definite by the grant of Gov. Vaudreuil of 1743, confirming to these settlers the said original grant, but the commissioners appointed by the act of Congress, having full power in the premises, established and defined such boundaries, and their decision was confirmed by a subsequent act of Congress. It is obvious, therefore, that, since the boundaries were so established, all parties, and the courts as well, must be bound thereby. It must be conceded, also, we think, that if the United States owned any lands, or an interest therein, included within the boundaries as fixed by it, or any right, interest or title which would be appurtenant to any such lands, such lands, title or interest must have passed by virtue of its acts confirming title and fixing the boundaries of the lands in question to and for said inhabitants. We are of the opinion, also, that in making the Mississippi river the south and west boundary of the grant in question, Congress must have used the terms employed in fixing such boundary in the legal sense commonly attached to them in this country, otherwise we would expect to find some qualification of or reservation to such terms. Even if, as contended by plaintiffs in error, by the old French law in force in the territory when the original grant was made, the grant of lands bounded by the Mississippi river on one side would not carry with it any island in said river which might be formed therein, still, such was not the common law generally in force in this country. Thus, it was held in *Middleton* v. *Pritchard*, 3 Scam. 510, that where the government makes a grant, and its own act shows an intention not to make any reservation, the grant will be intended to include all that might properly pass under it by the terms employed, and that grants by the government are to be construed according to the common law, unless some act has been done by the government to qualify or exclude that construction, and that all grants by the government having

their boundaries upon streams not navigable by the common law, entitle the grantees to all islands lying between the main land and the center of the thread of the current. In so construing the acts of Congress in the premises we are not in conflict with the rule as laid down by the Supreme Court of the United States, that a legislative grant of land from the government is not to be construed as a warranty, but as a release only, and that if there be any doubt it should be resolved against the grantee. *Slidell v. Grandjean*, 111 U. S. 412; *Rice* v. *Railway Co.* 1 Black, 358.

It was in the next place contended by defendant below, that the right of recovery by plaintiffs in error was barred by the Statute of Limitations of twenty years' adverse possession by him under claim of ownership, and evidence was given tending to prove the fact of such possession. But it is insisted by plaintiffs in error that the statute cannot be relied on to defeat the title or the recovery of these lands, for the reason that they are held in trust for a public purpose, and that the commons in question are inalienable, and the title thereto cannot be acquired by adverse possession.

The grant of Vaudreuil contained, among other things, the following: "In consequence of which the said point, as it is above designated, shall remain in common without altering its nature, nevertheless reserving to us the power, whenever the case may require it, of granting the said commons to the inhabitants established and who may establish, and this on the representations which may be made to us by the commandants and sub-delegates on the said places." We have seen that the deed of cession of Virginia to the United States provided "that the French and Canadian inhabitants and other settlers of the Kaskaskias shall have their possessions and titles confirmed to them," and that they were so confirmed by the United States. The Illinois constitution of 1818 provided (art. 8, sec. 8,) as follows: "All lands which have been granted as a common to the inhabitants of any

town, hamlet, village or corporation, by any person, body politic or corporate, or by any government having power to make such grant, shall forever remain common to the inhabitants of such town, hamlet, village or corporation, and the said commons shall not be leased, sold or divided under any pretense whatever." When the constitution of 1848 was adopted a special article in reference to "commons" was inserted, being article 11, which was identical with the above provision of the constitution of 1818, except as to the prohibition of alienation in any manner, in lieu of which the following was inserted: "But the said commons, or any of them, or any part thereof, may be divided, leased or granted, in such manner as may hereafter be provided by law, on petition of a majority of the qualified voters interested in such commons, or any of them."

In pursuance of this provision of the constitution of 1848, the legislature, in 1851, on the petition of a majority of the qualified voters of Kaskaskia interested in said commons, passed an act reciting that the inhabitants of Kaskaskia were entitled to the use and benefit, in common, of these lands, by virtue of an ancient grant recognized and confirmed by the government of the United States, and that the right to lease said lands had been granted by the constitution of this State,—which act constituted five persons named therein a body corporate and politic, by the name and style of "The President and Trustees of the Commons of Kaskaskia," giving them and their successors perpetual succession and existence, with power to sue and be sued, etc. Provision was made for the election of the succeeding trustees by the legal voters of the town of Kaskaskia, and power was given them to survey the lands contained in said commons and divide them into lots, and to lease them for a period not exceeding fifty years, to the best and most responsible bidder, and to apply the proceeds "to the education of the children of the inhabitants of Kaskaskia, and such residents

as are, by immemorial custom, commoners upon said commons, and the children of the lessees," with power to erect or purchase one or two buildings for schools, employ teachers, and to establish a library or libraries for such school, and for said purposes to use the proceeds of the leasing of said lands. The said president and trustees were also authorized to institute suit against any person or persons trespassing upon said commons, and for use and occupation against any person in possession, or who might thereafter take possession without leasing. They were also authorized to appropriate such portion of the proceeds from the leasing of said commons for the support and advancement of religion, as should be requested by a majority of the voters of said town of Kaskaskia by their petition indicating the religious purposes to which the same should be applied. (Ill. Private Laws of 1851, p. 5.) This corporation so created was not vested with any title to the lands in question, but was simply clothed with a trust for the benefit of the aforesaid inhabitants, as designated in the statute. It had no power to alien any part of said commons in fee, nor to transfer any greater interest than a lease for fifty years, nor had the inhabitants of Kaskaskia any such power. The constitution of 1870 contains no provision on the subject; and hence, without a further enabling act of the legislature there is no power vested anywhere to convey the fee to the said lands.

In commenting on the title to a parcel of the Cahokia commons in *Haps* v. *Hewitt*, 97 Ill. 498, and which was approved in *Rutz* v. *Kehn*, 143 Ill. 558, this court said (p. 502): "We are of opinion that, prior to any attempted transfer or disposition of the lot in question through which either of the parties to this controversy claims, the inhabitants of the village of Cahokia, as a distinct community, had, by national grant and confirmation, become the owners in fee of these commons, including the lot now in controversy. Their title has been distinctly recognized at dif-

ferent times and in a variety of ways, both by the national and State governments, and it is a matter, therefore, of no material consequence to determine the precise period and means by which it became fully confirmed in them. We do not wish to be understood, from what we now say, as holding that the various individuals who happened to be residents of the village of Cahokia at the time of such grant and confirmation became joint tenants or tenants in common of the lands in question. On the contrary, as mere individuals they took no legal title whatever. As individuals they acquired only such rights as were incident to residence in a village having the ownership of so valuable a property. By virtue of the act or acts of Congress through which this title was conferred, the inhabitants of Cahokia village were, as a community, by implication, constituted an artificial or corporate body for the purposes of receiving and holding the lands in question for the benefit of the community as a body of people, but for no other purposes. (Dillon on Mun. Corp. secs. 21, 22, (1st ed.); Angell & Ames on Corp.) The creation of this artificial body, and investing it with the title to these lands, did not necessarily clothe it with power to convey or otherwise dispose of them, but it was entirely competent for the legislature to authorize it to do so, and provide the necessary agencies through which this might be effected, and to otherwise provide for the better management and government of the business affairs of the community, which it, from time to time, has done from the earliest period of our State government to the present time."

But so far, as before shown, no authority has been conferred by the legislature under which the lands here in question could be aliened in fee,—that is, as to the commons of Kaskaskia. The corporation created by the act of 1851 was a public or *quasi* municipal corporation. "Public corporations are not voluntary associations at all, and there is no contractual relation between the cor-

porators who compose them.   They are merely government institutions, created by law for the administration of the affairs of the community."   Morawetz on Corp. (2d ed.) sec. 3.

It has long been settled law in this State, that the Statute of Limitations will run against a municipal corporation in respect to property held in its private capacity but not in respect to property held by it in trust for the public.   (*County of Piatt* v. *Goodell*, 97 Ill. 84; *City of Chicago* v. *Middlebrooke*, 143 id. 265; *Greenwood* v. *Town of LaSalle*, 137 id. 225; *City of Alton* v. *Illinois Trans. Co.* 12 id. 38; *Logan County* v. *City of Lincoln*, 81 id. 156; *Lee* v. *Mound Station*, 118 id. 304; *Catlett* v. *People*, 151 id. 16.)   In *County of Piatt* v. *Goodell*, *supra*, it was said (p. 92):   "The county had a perfect right to sell or otherwise dispose of the same (a tract of swamp land held by it) at pleasure, at any time before the statute run.   The public generally had no interest in it in common with the citizens and tax-payers of that county."   Most of the cases give as one reason for the distinction, that as to property held by such corporations in their private capacity the corporation may sell and dispose of it at pleasure; but the principal reason given is, that as to property held in trust by it for the public generally, its title is held in trust only for the general public, and that the rights of the public cannot be barred by the Statute of Limitations, because of the ancient maxim of the common law, *nullum tempus occurrit regi.*

It cannot be said in the case at bar that the president and trustees constituting the corporation aforesaid held the title to these commons in trust for the general public. Indeed, it cannot be said that they held the title at all, and they can maintain this suit only by authority of the statute.   They were, otherwise, merely clothed with a portion of the power and authority which resided in the State in its sovereign capacity, to subdivide and dispose of the lands in question.   It is difficult to see how by

any act, or neglect to act, by these officers, any greater title could be acquired by any one than they were authorized by law to confer. And the same reasoning would seem to properly apply to the inhabitants of the village. They could not divide, convey or convert to any other use these lands, or any part of them, except by authority granted to them by the sovereign power of the State. By the terms of the grant, and the express recognition thereof by the constitutions of 1818 and 1848, and by acts of the legislature, there was no power residing anywhere, except in the State itself, to authorize a segregation of these lands, or their diversion to any use different from that provided for in the grant, or their conveyance *en masse,* or in separate parcels, in fee or for years. We can see no difference between such a case and one where the title should be held in trust by the State for the use and benefit of a portion of the public for certain specified purposes, as respects the applicability of the Statute of Limitations. See *Johnston* v. *Irwin,* 3 S. & R. 291.

As before said, we have heretofore held, that where the title is held by the municipality in trust for the general public the statute cannot be applied, and we are of the opinion that the same rule should be applied in a case not precisely the same as, but in principle analogous to, the one at bar, where the title should be vested in the State in trust for a portion of the public. The Statute of Limitations could not run against the State in any capacity. To sustain the decision of the court below, that the title to this island of the inhabitants of Kaskaskia is barred by the Statute of Limitations, is to hold that, in violation of the terms of the grant and of the laws of the State recognizing and protecting it, this part of the commons may be severed from the rest, diverted to another use, and the title thereto in fee be acquired and the power of the State in respect thereof be taken away. To so hold is to decide that the State itself may, by adverse possession and limitation of time,

be shorn and barred from the exercise of its sovereign power in respect to the alienation of these lands.

While the cases before mentioned, holding that the statute will not run as to rights held by municipal and other public corporations in trust for the general public, are distinguishable in some respects from the case at bar, still, we are of the opinion that the general principles there announced ought to be applied here, and that the application of the Statute of Limitations to cases of this character would be against public policy. The case is in many respects *sui generis,* but, applying the principles before mentioned, we must hold that the defendant below acquired no title under the Statute of Limitations by his adverse holding of twenty years.

In many of the States of the Union the rule adhered to in this State is not followed, but it is held that the Statute of Limitations will run against municipal corporations in all respects to the same extent as against individuals. This question is elaborately reviewed in a note to *City of Fort Smith* v. *McKibbin,* 48 Am. Rep. 19, where the opinion in *City of Wheeling* v. *Campbell,* 12 W. Va. 36, is set out. In reviewing the case of *Morey* v. *City of Providence,* 10 R. I. 52,—where it was held that where land was dedicated for the use of the people of Providence and not for the public or the people of the whole State, and where the State had no interest in the use thereof, a title might be acquired by adverse possession; that the use being for a limited portion of the public, the doctrine of adverse possession would apply to it,—it was said in the *Wheeling case* that the distinction made in the Rhode Island case was not made in any of the many cases there reviewed, and it was thought not to be founded in good reason. But however that may be, and whatever the rule may be in other States, the doctrine in this State is as we have before stated.

We do not wish to be understood as holding that if the inhabitants of the village of Kaskaskia, as the owners

of these commons, had been incorporated, and endowed by the State with full authority to divide, divert and convey such commons, or any part thereof, in fee, the Statute of Limitations would not run against them as in other cases. That question is not presented by the record.

For the reasons stated we are of the opinion that the learned judge of the circuit court erred in his decision, and the judgment of the court below is therefore reversed, and the cause is remanded for further proceedings not inconsistent with the views herein stated.

*Reversed and remanded.*