## John Haps

*v.*

## William C. Hewitt *et al.*

*Filed at Mt. Vernon February 3, 1881.*

1. CAHOKIA COMMONS—*nature of the grant.* The inhabitants of the village of Cahokia, as a distinct community, have, by national grant and confirmation, become the owners in fee of the Cahokia commons,—not that the various individuals who happened to be residents of the village at the time of such grant became joint tenants or tenants in common of such lands;—on the contrary, as individuals they took no legal title whatever, but acquired such rights only as were incident to residence in a village having the ownership of such property.

2. By virtue of the act or acts of Congress, the inhabitants of Cahokia village were, as a community, by implication, constituted an artificial or corporate body for the purposes of receiving and holding the lands for the benefit of the community, as a body of people, but for no other purpose.

3. SAME—*power of disposition.* The creation of this artificial body, and investing it with the title to the commons, did not necessarily clothe them with power to convey or otherwise dispose of them, but it was competent for the legislature to authorize it to do so, and provide the necessary agencies through which this might be effected.

4. By the act of February 17, 1841, the supervisor of such village and commons was authorized to survey and divide any part of the commons into lots, and lease the same for any number of years, not exceeding one hundred; and by the act of March 21, 1874, the supervisor was authorized to convey, in fee, the reversion in such parts of the lots as had before been leased. Under these acts the holder of a leasehold interest in a lot, by acquiring the reversion, becomes the absolute owner in fee, the leasehold estate being merged in the fee.

5. Where the supervisor, in 1841, files in the proper office for record a plat of a survey dividing a portion of the commons into lots, in strict compliance with the statute, and afterwards leases one of the lots for ninety-nine years, by a lease regular in every respect, a second lease, made by him, on a new platting, of the same lot, though designated by a different number, will be absolutely void, and can not be received in an action of ejectment to show an outstanding title.

6. CONSTITUTIONAL LAW—*special legislation—sale of lands of minors and others under disabilities.* That part of sec. 22 of art. 4, of the present constitution, which forbids the passage of any special or local law regulating "the sale or mortgage of real estate belonging to minors or others under disability," applies only to infants, married women, and persons of unsound mind, and not to artificial beings or associations of individuals of any kind. Under limitation laws, the expression is applied also to persons in prison, or beyond seas, which is beyond the State, but it is not considered the constitutional clause was intended to include these two classes.

APPEAL from the City Court of East St. Louis; the Hon. CHARLES T. WARE, Judge, presiding.

Mr. E. B. DAVIS, for the appellant:

This was an action of ejectment, by appellee, Hewitt, against Haps, the appellant, for lot 97 of Illinois City, laid in survey 777. Appellee relies for a recovery, in part—

1st. Upon a lease from the supervisor of Cahokia, Theo. M. Walsh, of January 7, 1854, and a chain of conveyances down to himself.

2d. Upon a deed, in fee, from the supervisor of Cahokia, of February 5, 1880, to Frank B. Bowman, converting said lease to Walsh into a fee simple title, under the act of March 21, 1874.

The validity of the lease and deed is disputed. Before the supervisor could legally lease any part of the commons

under the act of February 17, 1841, two conditions had to be performed, to-wit: 1st, the surveying of the premises to be leased, and, 2d, the recording of a plat so made, showing the number of acres, etc., in the recorder's office. The record fails to show the performance of these conditions.

Appellant contends that the act of March 21, 1874, enabling certain towns and villages to dispose of commons, under which the deed was made, is invalid, under the constitution of 1870, which prohibits and forbids the "passage of local or special laws relating to the sale or mortgage of real estate belonging to minors or others under disability." Art. 4, sec. 22.

Were the inhabitants of the village of Cahokia under a disability to convey the premises in controversy, prior to the act of March 21, 1874? Is the law special or local?

That the inhabitants of Cahokia held the title to the premises in controversy, with other "commons," not as tenants in common but as a community, prior to the date of the admission of this State into the Union, and since, seems quite clear. They had an indefeasible title to the "commons," but were, by the constitution of 1818, incapacitated from selling or transferring the same, or any part thereof, until power of alienation was given them by an act of the General Assembly,—and none such was given, or attempted to be given, prior to March 21, 1874. "Under disability," defined, means incapacity to do a legal act, arising from the peculiar condition of the person, etc. Does this not bring them within the phrase of, "or others under disability?"

That the act is "special or local," we think there can be no question. "Special or local laws" are those touching and relating only to a portion of the State or its citizens. "General laws," on the other hand, are those relating and touching all those within the jurisdiction of the law-making power. The number of persons upon whom the law will have any desired effect may be very small, yet it must operate equally

and uniformly upon all within the jurisdiction. *People, etc.* v. *Wright,* 70 Ill. 398; *People, etc.* v. *Cooper,* 83 id. 585.

According to the Federal census of 1870, the State of Illinois has 102 counties, and of this number but 9 have a population of 40,000 or more.

There is no difference in principle between a special and local law, and one, though in terms general, producing the same effect by its construction and legal execution. *Devine* v. *Comis,* 84 Ill. 590.

Mr. FRANK B. BOWMAN, for the appellee:

The inhabitants of the village of Cahokia were the original owners of the land comprising Illinois City, laid out in survey No. 777.

While other "commons" were, by a constitutional provision (sec. 8, art. 8, const. 1818,) directed to be preserved undivided, these were especially exempt from this restriction by this very section of that constitution. The inhabitants of Cahokia were left free to lease, sell or divide the same, whenever they saw fit. *Lavalle* v. *Strobel,* 89 Ill. 379.

Under an act of the legislature, the supervisor of the village was authorized to survey and plat the commons, and to lease the same for a term not exceeding one hundred years, under which a lease was made to Walsh for ninety-nine years, in 1854, under which the appellee, in part, claims title.

Appellant's other point goes to the validity of the conversion of the leasehold of 1854 into a fee simple title, under the act of March 21, 1874. (Laws 1874, p. 67.) He says that this law is unconstitutional and void, because, as he says, it falls within the prohibition of the 22d section of article 4 of the constitution, which prohibits the General Assembly from passing any local or special law for the sale or mortgage of real estate belonging to minors or others under disability. What does this clause prohibit? It simply forbids the passage of a local or special law giving authority for the sale or incumbrancing of real estate belonging to persons who, accord-

ing to the common and general understanding and meaning of the expression, are classed with " minors," as persons under " disability," and who, either by existing statutes or by recognized rules of construction of constitutions and laws, are included with persons such as minors, as persons under disability as a class.

The words "or others under disability," following a particular class, (minors, for instance,) are to be construed as referring to persons *ejusdem generis.* *Sandiman* v. *Breach,* 7 B. & C. 96; *Commonwealth* v. *Dallis,* 3 Yeates, 303.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

This was an action of ejectment, brought by appellee against appellant in the City Court of East St. Louis, for the recovery of lot 97 of "Illinois City," being now a part of East St. Louis. There was a recovery in the court below, and the defendant brings the case to this court by appeal.

The town of "Illinois City" was laid out in 1817 by the inhabitants of Cahokia village, on what is known as the "Cahokia commons," being a part of the United States survey, No. 777.

As both parties to the present controversy claim title to the lot in question through the inhabitants of Cahokia village, it is not necessary to go into the history of the title to these lands, further than is necessary to present our views upon the questions raised upon the record, but will merely refer to what is said upon that subject in *Lavalle* v. *Strobel,* 89 Ill. 370.

Suffice it to say, we are of opinion, that, prior to any attempted transfer or disposition of the lot in question, through which either of the parties to this controversy claims, the inhabitants of the village of Cahokia as a distinct community had, by national grant and confirmation, become the owners in fee of these commons, including the lot now in controversy. Their title has been distinctly recognized at different times and in a variety of ways, both by the National and State governments, and it is a matter, therefore, of no

material consequence to determine the precise period and means by which it became fully confirmed in them. We do not wish to be understood, from what we now say, as holding that the various individuals who happened to be residents of the village of Cahokia at the time of such grant and confirmation, became joint tenants or tenants in common of the lands in question. On the contrary, as mere individuals, they took no legal title whatever. As individuals, they acquired only such rights as were incident to residence in a village having the ownership of so valuable a property. By virtue of the act or acts of Congress, through which this title was conferred, the inhabitants of Cahokia village were, as a community, by implication, constituted an artificial or corporate body for the purposes of receiving and holding the lands in question for the benefit of the community as a body of people, but for no other purposes. Dillon on Munic. Corp. secs. 21 and 22, (1st ed.); Angell and Ames on Corp.

The creation of this artificial body, and investing it with the title to these lands, did not necessarily clothe it with power to convey or otherwise dispose of them; but it was entirely competent for the legislature to authorize it to do so, and provide the necessary agencies through which this might be effected, and to otherwise provide for the better management and government of the business affairs of the community, which it, from time to time, has done from the earliest period of our State government to the present time. To this end, in 1827, the legislature, by special act, authorized the inhabitants of Cahokia to elect annually, from amongst themselves, some suitable person to act as supervisor of the community, and by the express terms of the act he was made "supervisor of the common lands attached to the village," and enabled to sue and be sued with respect to the same.

By the act of February 17, 1841, entitled "An act to authorize the supervisor of the village of Cahokia to lease part of the common appertaining to said village," the supervisor was authorized to have surveyed and divided into lots

any part of the commons he might deem proper, and make leases of the same either at public or private sale, as he might think best, for any number of years not exceeding one hundred.

By virtue of the authority conferred by this act, the supervisor, on the 7th of January, 1854, executed a lease of the lot in question to Theodore M. Walsh for the term of ninety-nine years. Through a number of assignments, Frank B. Bowman, on the 19th day of January, 1880, became possessed and owner of the term created by the above lease.

By the act of March 21, 1874, the legislature enlarged the supervisor's power of disposition over these commons so as to authorize him to convey in fee the reversion in such parts of them as had theretofore been leased. In pursuance of this act, the supervisor, on the 5th of February, 1880, by deed, in fee, conveyed the reversion of the lot in question to the said Frank B. Bowman, by virtue of which his leasehold estate was merged in the fee, and the latter, by deed of the 16th of February, 1880, conveyed the premises to appellee.

On the trial below, the defendant, for the purpose of establishing an outstanding title in another than the plaintiff, showed that notwithstanding the lease by the supervisor to Walsh, as above stated, that that portion of the commons which constituted the town limits of " Illinois City," including the lot in question, was, during the year 1871, by the directions of the attorney of the supervisor, replatted as " lot 303, fifth subdivision of Cahokia commons."

In connection with this fact the defendant proposed to show further, that on the 20th of December, 1876, the supervisor executed a lease to one A. X. Illinski to the above lot 303, but this evidence, upon the objection of the plaintiff, was excluded by the court, and the defendant excepted. The theory of this defence is based upon the assumption that the conveyance from the supervisor to Walsh was invalid, because, as is claimed, the supervisor did not, previously to executing the lease, make a proper plat of that part of the commons

which includes the lot in question, which, it is claimed, was a condition precedent to the making of the lease, and not having been performed, the lease is a nullity.

Without expressing any opinion upon the legal proposition presented by the hypothesis, it is sufficient to say that we do not understand the facts as assumed by appellant.

The record shows, that on the 26th of May, 1841, but a short time after the act authorizing the execution of leases went into effect, the supervisor filed in the proper office for record a plat subdividing survey 777 into lots numbered from 1 to 54 inclusive, leaving undisturbed so much of the survey as constituted the town limits of Illinois City, marked on the plat "Illinois City," and the evidence shows that this plat was used by the supervisor and his successors in office, in leasing parts of said survey. We see no reason why this was not a strict compliance with the act requiring the grounds to be platted for the purpose of making leases. It follows, therefore, the theory of the defence, in this respect, was wholly untenable.

The lease of the supervisor to Walsh being authorized by law, and regular in every respect, so far as we can discover, the subsequent lease to Illinski, so far as it affected the lot in controversy, was wholly unwarranted and absolutely void as to Walsh and those claiming under him, and was, therefore, properly held inadmissible as evidence against appellee.

It is also contended that the act of March 21, 1874, entitled "An act to enable towns and villages in this State having 40,000 inhabitants according to the last Federal census, having commons, to dispose of the same," under which the reversion in the premises in question was conveyed by the supervisor to Bowman, is in conflict with so much of section 22 of article 4 of the present constitution as forbids the passage of any special or local law regulating "the sale or mortgage of real estate belonging to minors or others under disability." We can not concur in this view. The expression "laboring under disability," or "under disability," is gener-

ally applied to infants, married women and persons of unsound mind, and so the term was doubtless intended to be applied by the framers of the constitution. Under limitation laws, the expression is applied also to persons in prison and beyond the seas, or, as we express it, "beyond the State," but we do not think it was intended to include these two classes.

The privileges and protection which the law throws around this class of persons have never been extended to mere artificial beings or associations of individuals of any kind. Indeed, the position seems so palpably untenable as to not admit of serious consideration.

Perceiving no error in the judgment of the court below, it will be affirmed.

*Judgment affirmed.*