W. H. STEAD, Attorney General, *et al.* Appellees, *vs.* THE
   PRESIDENT AND TRUSTEES OF THE COMMONS OF KAS-
   KASKIA, Appellants.

*Opinion filed December 8, 1909—Rehearing denied Feb. 2, 1910.*

1. COMMONS OF KASKASKIA—*State may maintain suit to com-
pel trustees of commons to honestly administer trust.* The State
of Illinois has such an interest in the commons of Kaskaskia that
it may, through its Attorney General, file an information in the
nature of a bill in chancery to compel the president and trustees
of the commons of Kaskaskia to honestly administer the trust im-
posed upon them by the statute.

2. SAME—*legal title is vested in inhabitants of parish in trust
and not absolutely.* The legal title to the commons of Kaskaskia
is vested in the parish of the Immaculate Conception of Kaskas-
kia in trust' for the inhabitants of the parish and not in the in-
habitants of the village of Kaskaskia in trust for the inhabitants
of such village; but such title is not absolutely vested in the in-
habitants of the parish as individuals. (*Hebert* v. *Lavalle,* 27 Ill.
448, distinguished.)

3. SAME—*word "town," used in constitutions of 1818 and 1848
and in act of 1851, means "parish."* The word "town," used in
the constitutions of 1818 and 1848 and in the act of 1851, is syn-
onymous with the word "parish," as used in the French patent of
1743, and its use did not have the effect to in any way limit the
title to the commons of Kaskaskia nor to divest the inhabitants of
the parish of the Immaculate Conception of Kaskaskia of their
title to such commons.

4. SAME—*title of inhabitants of parish cannot be limited to and
vested in inhabitants of village.* The title of the inhabitants of
the parish of the Immaculate Conception of Kaskaskia to the com-
mons of Kaskaskia has not been and cannot lawfully be limited to
and vested in the inhabitants of the village of Kaskaskia; but the
title of the inhabitants of the parish of the Immaculate Conception
of Kaskaskia is not such a one as gives them a right to lease, con-
vey or otherwise dispose of the lands.

5. SAME—*title to commons is held by artificial body in which
it was placed by French grant.* Until the State of Illinois shall
provide for the sale of the commons of Kaskaskia the title to such
commons must be held to be in the inhabitants of the parish of
the Immaculate Conception of Kaskaskia, as the artificial body in
which such title was placed by the original French grant.

6. SAME—*State cannot vest title to commons in inhabitants of village of Kaskaskia.* While the legislature, or the people by constitutional enactment, may authorize the segregation or diversion of the commons of Kaskaskia, neither the legislature nor the people have the power to divest the title of the inhabitants of the parish to such commons and invest the same in the inhabitants of the village of Kaskaskia.

7. SAME—*legal voters residing on the island of Kaskaskia may vote at elections of trustees.* At all elections held for the purpose of electing trustees for the commons of Kaskaskia all legal voters residing upon the island of Kaskaskia are entitled to vote.

8. SAME—*trustees of commons are not entitled to compensation for services.* Since no provision is made in the act of 1851 for compensation for the services of trustees of the commons of Kaskaskia elected under that act such trustees are not entitled to compensation for their services.

9. SAME—*the act of 1851 is sole source of trustees' duties and powers.* The act of 1851 (Private Laws of 1851, p. 5,) clearly defines the duties of the trustees of the commons of Kaskaskia, and is the only instrument to which the trustees, the beneficiaries of the trust and the courts must look to determine the powers and duties of such trustees.

10. SAME—*a court of chancery may remove trustees illegally elected.* The trust in the commons of Kaskaskia created by the act of 1851 is in the nature of a charitable trust for educational and religious purposes, and hence a court of chancery, upon proper proof, may remove trustees of such commons who are illegally elected and provide for the holding of a new election by some officer appointed by the court.

11. SAME—*court of chancery has the power to compel honest administration of trust.* It is within the power of a court of chancery having jurisdiction, to set aside leases fraudulently and illegally made by the trustees of the commons of Kaskaskia, and to compel old trustees, who are parties to the suit, to account for moneys coming into their hands which they have wrongfully paid out or misappropriated.

12. SAME—*funds derived from leasing commons may be used for religious purposes.* Section 3 of article 8 of the constitution of 1870 is only intended to prohibit the use, for sectarian or religious purposes, of funds which form a part of the public revenues of the State, and does not preclude the use, for religious purposes, of funds derived from leasing the commons of Kaskaskia, and such funds may be so used if the manner of appropriating the same is in compliance with the act of 1851.

APPEAL from the Circuit Court of Randolph county; the Hon. B. R. BURROUGHS, Judge, presiding.

A. E. CRISLER, and H. C. HORNER, for appellants.

W. H. STEAD, Attorney General, and JOHN W. TWEED, State's Attorney, (EMERY ANDREWS, of counsel,) for appellees.

Mr. JUSTICE HAND delivered the opinion of the court:

This was an information in the nature of a bill in chancery, filed by the Attorney General and the State's attorney of Randolph county, against the president and trustees of the commons of Kaskaskia and others, charging said trustees with a breach of their official duties and asking that they be removed from office and that certain of their acts be annulled and set aside, and for an accounting, and for general relief. Answers and replications were filed and a trial was had, and a decree was entered granting, in part, the relief prayed for in the information. An appeal has been prosecuted to this court by the defendants, and errors have been assigned by the appellants and cross-errors by the appellees.

All the facts necessary to an understanding of the case and the decree from which the appeal is prosecuted will be hereinafter stated in this opinion.

The first contention made by the appellants is that the information cannot be maintained, as it is said the Attorney General or said State's attorney, or the inhabitants of the island of Kaskaskia, who reside outside of the limits of the village of Kaskaskia and upon whose behalf relief is sought, have no interest in the commons of Kaskaskia or the administration of said commons by said trustees, as the title to said commons is vested in the inhabitants of the village of Kaskaskia, and the president and trustees

243—16

of the commons of Kaskaskia are administering said commons for the benefit of the inhabitants of said village of Kaskaskia, none of whom are complaining in this proceeding of the action of the president and trustees of the commons of Kaskaskia. The determination of the question of the right of the Attorney General and said State's attorney to file the information necessarily, therefore, involves a determination of the question whether the legal and beneficial title to the lands known as the commons of Kaskaskia rests absolutely in the inhabitants of said village of Kaskaskia as said village now exists, or whether the State has such an interest in said commons as will authorize the Attorney General, or in this case the Attorney General and the State's attorney of the county in which they are situated, as the representatives of the State, to file an information in the nature of a bill in chancery to require the president and trustees of the commons of Kaskaskia to carry out, honestly and efficiently, the duties imposed upon them by the act of the legislature under which they were elected.

The title to the lands composing the commons of Kaskaskia, like the title to all other lands in the Mississippi valley, was of a possessory character prior to the French occupation of that territory and rested in the American Indian. In 1673 Joliet and Marquette discovered the Illinois country, and in 1682 LaSalle took possession of the country tributary to the Mississippi river in the name of Louis XIV, and the lands of which the commons of Kaskaskia form a part were held by France until the year 1763. In 1675 Marquette established the mission of the Immaculate Conception at a point on the Illinois river near where is now located the village of Utica, in LaSalle county. In 1700 the mission of the Immaculate Conception was transferred to the French settlement established by James Gravier, a Jesuit missionary, near the mouth of the Kaskaskia river, which settlement was known as Our Lady of Kaskaskias and was located near where the village of Kaskas-

kia now stands.  Subsequent to the year 1700 the commons
of Kaskaskia were granted to the parish of the Immacu-
late Conception of Kaskaskia by the French government.
No record, however, of this grant has been preserved.  It
was, however, confirmed to the inhabitants of the parish of
the Immaculate Conception of Kaskaskia by a patent is-
sued August 14, 1743, by Pierre de Rigault de Vaudreuil,
Governor, and Edme Gatien Salmon, commissary orderer
of the province of Louisiana, subject to certain conditions,
in the following words :  "Seen the petition to us presented
on the 16th day of June of this present year by the inhab-
itants of the parish of the Immaculate Conception of Kas-
kaskia, dependence of the Illinois, tending to be confirmed
in the possession of a common which they have had a long
time for the pasturage of their cattle in the point called
*Le pointe de bois,* which runs to the entrance of the river
Kaskaskia.  We, by virtue of the power to us granted by
his majesty, have confirmed and do confirm to the said in-
habitants the possession of the said common," etc.  In 1763
this territory was ceded by the French to Great Britain and
in 1765 taken possession of by the English government,
and in 1778, at the time of the conquest of the North-west
territory by George Rogers Clark, it was wrested from the
English and acquired, by right of conquest, by Virginia,
and was retained by Virginia until the year 1784, when, on
March 1 of that year, it was ceded by that commonwealth
to the United States.  The deed by which it was ceded,
among other things, provided "that the French and Ca-
nadian inhabitants and other settlers of the Kaskaskias,
St. Vincents and the neighboring villages, who have pro-
fessed themselves citizens of Virginia, shall have their pos-
sessions and titles confirmed to them and be protected in
the enjoyment of their rights and liberties."  On Decem-
ber 31, 1809, a commission appointed by the Congress of
the United States to examine certain old French grants,
among which was that of the commons of Kaskaskia, re-

ported that "on the 14th August, 1743, Monsieur Vaudreuil, Governor, and Monsieur Salmon, commissary ordonnateur of the province of Louisiana, granted to the inhabitants of Kaskaskia a tract of land as a common for the use of the said inhabitants, which seems to have been bounded north by the southern limit of the village, east by the Kaskaskia river, and south and west by the Mississippi and the limits of the common field, so called, which will be found laid down in the plat annexed, on certain conditions unnecessary here to state, since they relate to the domestic police of said village, reserving, however, to the government a right to grant away to such individuals as had settled or might settle in said village, such portions of said common as it might think necessary." And by acts of Congress approved May 1, 1810, and February 20, 1812, the action of the said commissioners was approved, as follows: "That all the decisions made by the commissioners appointed for the purpose of examining the claims of persons claiming lands in the district of Kaskaskia, in favor of such claimants, as entered in the transcript of decisions bearing date the 31st day of December, 1809, which have been transmitted by the said commissioners to the Secretary of the Treasury according to law, be and the same are hereby confirmed." (Act approved May 1, 1810, 2 U. S. Stat. 607.) "The decisions made by the commissioners heretofore appointed for the purpose of examining the claims of persons to lands in the district of Kaskaskia, in favor of such claimants, to town or village lots, out-lots or rights in common to commons and common fields, as entered in the transcript of decisions bearing date the 31st day of December, 1809, which have been transmitted by the said commissioners to the Secretary of the Treasury according to law, be confirmed to all such rightful claimants according to their respective rights thereto." (Act approved Feb. 20, 1812, 2 U. S. Stat. 678.)

Prior to the admission of Illinois as a State, in the year 1818, there can be no reasonable contention, we think, but that the legal title to said commons of Kaskaskia had passed out of the United States. Whether, however, the legal title to said commons vested in the inhabitants of the village of Kaskaskia or in the inhabitants of the parish of the Immaculate Conception of Kaskaskia may not be free from doubt. Nor do we deem it necessary for a proper determination of the question whether the Attorney General and said State's attorney can maintain this suit, to hold that the legal title to said commons of Kaskaskia is not in the inhabitants of the village of Kaskaskia, as we think it is clear, whether the legal title to said commons be held to be in the inhabitants of the village of Kaskaskia or in the inhabitants of the parish of the Immaculate Conception of Kaskaskia, that the State of Illinois has such an interest in the commons of Kaskaskia that it, through its principal law officer, the Attorney General of the State, can file an information in the nature of a bill in chancery to require the president and trustees of the commons of Kaskaskia to honestly administer the trust which has been imposed upon them by the terms of the statute under which they, as trustees, are administering the trust created by the statute with reference to said commons.

As has been seen, by the deed of cession of Virginia to the United States it was provided that the French and Canadian inhabitants and other settlers of the Kaskaskias should "have their possessions and titles confirmed to them," and that by two separate acts of Congress such possessions and titles were confirmed by the United States. It also appears that by article 8 of section 8 of the constitution of this State adopted in 1818 these commons were recognized and protected, where it was provided that "all lands which have been granted as a common to the inhabitants of any town, hamlet, village or corporation by any person, body politic or corporate, or by any government having power

to make such grant, shall forever remain common to the
inhabitants of such town, hamlet, village or corporation;
and the said commons shall not be leased, sold or divided
under any pretense whatever." And again, in the consti-
tution of 1848 a special article in reference to commons
was inserted, being article 11, which was identical with the
above provision of the constitution of 1818 except as to
the prohibition against alienation in any manner, in lieu of
which the following was inserted: "Said commons, or any
of them, or any part thereof, may be divided, leased, or
granted, in such manner as may hereafter be provided by
law, on petition of a majority of the qualified voters in-
terested in such commons, or any of them." And while
we think it is clear the legal title to such commons passed
out of the United States and vested in the inhabitants of
the village of Kaskaskia or the inhabitants of the parish of
the Immaculate Conception of Kaskaskia, the title to said
commons did not vest in either the inhabitants of the vil-
lage or the inhabitants of said parish as individuals, abso-
lutely, but only in trust.

The commons of Cahokia were created by grant from
the French government at about the same time as the com-
mons of Kaskaskia were created. In commenting on the
title to a parcel of the commons of Cahokia in *Haps v.
Hewitt,* 97 Ill. 498, (which was approved in *Rutz v. Kehn,*
143 id. 558,) this court said (p. 502): "We are of opin-
ion that prior to any attempted transfer or disposition of
the lot in question through which either of the parties to
this controversy claims, the inhabitants of the village of
Cahokia, as a distinct community, had by national grant
and confirmation become the owners in fee of these com-
mons, including the lot now in controversy. Their title has
been distinctly recognized at different times and in a va-
riety of ways, both by the national and State governments,
and it is a matter, therefore, of no material consequence
to determine the precise period and means by which it be-

came fully confirmed in them.   We do not wish to be understood from what we now say, as holding that the various individuals who happened to be residents of the village of Cahokia at the time of such grant and confirmation became joint tenants or tenants in common of the lands in question.   On the contrary, as mere individuals they took no legal title whatever.   As individuals they acquired only such rights as were incident to residence in a village having the ownership of so valuable a property.   By virtue of the act or acts of Congress through which this title was conferred the inhabitants of Cahokia village were, as a community, by implication, constituted an artificial or corporate body for the purposes of receiving and holding the lands in question for the benefit of the community as a body of people, but for no other purposes.   (Dillon on Mun. Corp.—1st ed.—secs. 21, 22; Angell & Ames on Corp.)   The creation of this artificial body and investing it with the title to these lands did not necessarily clothe it with power to convey or otherwise dispose of them, but it was entirely competent for the legislature to authorize it to do so and provide the necessary agencies through which this might be effected, and to otherwise provide for the better management and government of the business affairs of the community, which it, from time to time, has done from the earliest period of our State government to the present time."

In *Trustees of Commons* v. *McClure*, 167 Ill. 23, which was an action of ejectment against the president and trustees of the commons of Kaskaskia to recover possession of a parcel of the commons of Kaskaskia, it was held, in a well considered opinion, that the title to said commons could not be divested by the running of the Statute of Limitations, by reason of the interest that the State of Illinois, in its sovereign capacity, had in said lands.   In that case, on page 44, it was said:   "By the terms of the grant, and the express recognition thereof by the constitutions of 1818

and 1848, and by acts of the legislature, there was no power residing anywhere, except in the State itself, to authorize a segregation of these lands, or their diversion to any use different from that provided for in the grant, or their conveyance *en masse* or in separate parcels, in fee or for years. We can see no difference between such a case and one where the title should be held in trust by the State for the use and benefit of a portion of the public for certain specified purposes, as respects the applicability of the Statute of Limitations."

Our conclusion therefore is that the information was properly filed by the Attorney General and said State's attorney.

It is further contended by the appellants that the court improperly held that under the act of 1851 all the legal voters residing on the island of Kaskaskia were entitled to vote at the election of trustees of the commons of Kaskaskia provided to be held under said act. The determination of this question involves a decision of the question whether the legal title to the commons of Kaskaskia is held by the inhabitants of the village of Kaskaskia in trust for the use of the inhabitants of said village, or whether the title to said commons is held by the inhabitants of the parish of the Immaculate Conception of Kaskaskia for the benefit of all the inhabitants of said parish.

At the time of its original settlement the village of Kaskaskia was situated on the west side of the Kaskaskia river, on a peninsula formed by the union of the Kaskaskia river with the Mississippi river, which is shown by the following plat, said plat being the plat prepared under the direction of the commission appointed by the United States government to settle the boundaries of certain French grants, including the French grant at Kaskaskia, (2 Am. St. Papers, 148,) said plat bearing date September 21, 1807:

The village of Kaskaskia was in the early history of the State its capital and the most important city of the State. Subsequently the Mississippi river cut across the upper end of the peninsula and near where the village stood, and the village was mostly washed away. Thereafter, by virtue of an act of the legislature the village was moved farther south, upon what is now the island of Kaskaskia. In the new village there now reside some forty or fifty voters, there now being upon the island something like twelve hundred inhabitants. As shown by the plat, the common field contained 8203 acres and the commons 6950 acres, making

in all 15,153 acres, and, as the trial court held, was co-termi-
nous with the boundaries of the parish of the Immaculate
Conception of Kaskaskia.    The patent issued to the com-
mons of Kaskaskia by Pierre de Rigault de Vaudreuil, Gov-
ernor, and Edme Gatien Salmon, commissary orderer of
the province of Louisiana, states that it was issued upon
the petition of the inhabitants of the parish of the Immacu-
late Conception of Kaskaskia, wherein the said inhabitants
asked that they be confirmed in the possession of a com-
mon which they have had for a long time for the pastur-
age of their cattle in the point called *Le pointe de bois,*
which runs to the entrance of the river Kaskaskia, and the
said patent confirms to the inhabitants of said parish of
the Immaculate Conception of Kaskaskia said common in
the following language: "We, by virtue of the power to
us granted by his majesty, have confirmed and do confirm
to the said inhabitants the possession of the said common,"
etc.    It is therefore too clear for argument that the original
grant of the commons of Kaskaskia ran to the inhabitants
of the parish of the Immaculate Conception of Kaskaskia,
and the deed from Virginia to the United States whereby
the lands of which these commons formed a part were
ceded, provided that the French and Canadian inhabitants
and other settlers of the Kaskaskias shall have their pos-
sessions and titles confirmed to them.    Subsequently the
grant of said commons was confirmed by two several acts
of Congress, and the title to said commons as thus con-
firmed was recognized and protected by the constitutions of
this State of 1818 and 1848.    We think it obvious, there-
fore, that the legal title to said commons vested in the in-
habitants of the parish of the Immaculate Conception of
Kaskaskia for the use of the inhabitants of said parish.
(*Haps* v. *Hewitt, supra; Rutz* v. *Kehn, supra; Trustees
of Commons* v. *McClure, supra.*)    We are also of the
opinion the word "town," used in the constitution of 1818,
the constitution of 1848 and the act of 1851, does not in

any way limit the title to these commons or have the effect
to divest the inhabitants of the parish of the Immaculate
Conception of Kaskaskia of their title to these lands, as we
are of the opinion (as was held by the trial court) the
word "town," used in the constitutions of 1818 and 1848
and the act of 1851, is synonymous with the word "parish," as used in the French patent of 1743.

Our conclusion, therefore, is, that the title of the inhabitants of the parish of the Immaculate Conception of
Kaskaskia in the commons of Kaskaskia has not been and
could not be lawfully limited to and vested in the inhabitants of the village of Kaskaskia. To destroy this old
French grant by depriving the inhabitants of the parish of
the Immaculate Conception of Kaskaskia of the title to the
lands composing the commons of Kaskaskia and to invest
the inhabitants of the village of Kaskaskia with such title
would be to violate the terms of the French grant whereby said commons were set aside for the use of the inhabitants of said parish and to override the provision of the
deed of cession from Virginia to the United States, which
would be a breach of good faith on the part of the State
of Illinois and is a construction of the constitutions and
statutes of the State of Illinois which should not be sanctioned by this court. The holding, however, that the legal
title to the commons of Kaskaskia is in the inhabitants of
the parish of the Immaculate Conception of Kaskaskia, for
the use of the inhabitants of said parish, does not invest
the inhabitants of said parish with such a title to said commons that they can lease, convey or otherwise dispose of
said lands. In the *Rutz case,* on page 567, it was said,
quoting from the *Haps case:* "The creation of this artificial body and investing it with the title to these lands
did not necessarily clothe it with power to convey or otherwise dispose of them, but it was entirely competent for the
legislature to authorize it to do so and provide the necessary agencies through which this might be effected." And

again, in the *McClure case* (p. 44) : "There was no power
residing anywhere, except in the State itself, to authorize
a segregation of these lands or their diversion to any use
different from that provided for in the grant, or their con-
veyance *en masse* or in separate parcels, in fee or for
years." Until, therefore, the legislature of this State shall
provide for the sale of the commons of Kaskaskia, the title
to those lands must be held to be in the artificial body
where it was placed by the original French grant. (*Doe*
v. *Hill,* Breese; 304; *Hebert* v. *Lavalle, 27* Ill. 448; *La-
valle* v. *Strobel,* 89 id. 370; *Haps* v. *Hewitt, supra; Rutz*
v. *Kehn, supra; Trustees of Commons* v. *McClure, su-
pra.*) While the legislature or the people, by constitutional
enactment, can authorize the segregation or diversion of
these lands, neither would have the power to divest the
title of the inhabitants of the parish and invest the title
thereto in the inhabitants of the village.

While the conclusion reached in this opinion that the
recipient of the title to the commons of Kaskaskia was the
inhabitants of the parish of the Immaculate Conception of
Kaskaskia and not the inhabitants of the village of Kas-
kaskia differs from the conclusion reached in *Hebert* v.
*Lavalle, supra,* where it was held the title to the commons
of Cahokia vested in the inhabitants of the village of Ca-
hokia, we think the two grants so far differ that there is
nothing inconsistent in what is held in this case with what
was held in the *Lavalle case,* and while we intend to say
nothing in this case which will overrule that case, we think,
as to the commons of Kaskaskia, it is historically and le-
gally certain that the title to the commons of Kaskaskia
vested in the inhabitants of the parish of the Immaculate
Conception of Kaskaskia and that the inhabitants of that
parish have never been divested of their title to said com-
mons. Our conclusion therefore is, that the trial court
properly held that in all elections for trustees of the com-
mons of Kaskaskia held under the act of 1851 every legal

voter residing upon the island of Kaskaskia should be per-
mitted to vote for said trustees.

It is further contended that the court erred in decree-
ing that the trustees of the commons of Kaskaskia elected
under the act of 1851 were not entitled to compensation
for their services as trustees. The act of 1851, under
which the appellants were elected as trustees, does not pro-
vide for the payment of compensation to the trustees elected
under that act, and no principle is better settled than that
a trustee cannot recover compensation for services per-
formed by him unless the instrument under which he is
appointed or the statute which provides for his election
makes provision for the payment to such trustee of com-
pensation. (*Huggins* v. *Rider,* 77 Ill. 360; *Cook* v. *Gil-
more,* 133 id. 139; *Arnold* v. *Alden,* 173 id. 229.) We
think no error was committed by the trial court in so far
as it held that the appellants were not entitled to compen-
sation as trustees.

It has been assigned as cross-error (3) that the court
erred in declining to remove from office those appellants
who were trustees of the commons of Kaskaskia and to
order an election to be held for a new board of trustees of
the commons of Kaskaskia, at which election all the legal
voters residing upon the island of Kaskaskia should have
the right to vote; (1 and 2) that the court erred in declin-
ing to set aside the leases on survey No. 1, made in 1905,
and on survey No. 4, made in 1889, and to order a re-leas-
ing of the lands covered by those surveys at a *bona fide*
public letting; (4) that the court erred in declining to re-
quire an accounting by the appellants who had been trustees
of the commons of Kaskaskia, and in not requiring those
appellants, jointly and severally, to re-imburse the commons
fund in whatever amount the court might find, upon such
accounting, said appellants had paid out or expended un-
lawfully; and (6) in decreeing that a portion of the fund
derived from the leasing of said commons might be used

for religious purposes and the support and advancement of such purposes, upon the presentation to said trustees of a petition, signed by a majority of the legal voters residing on the island of Kaskaskia, indicating the religious purposes to which the said fund should be applied and the amount to be applied.

The inhabitants of the parish of the Immaculate Conception of Kaskaskia formerly lived in the village of Kaskaskia and farmed the lands which they owned in fee and pastured their cattle upon the commons of Kaskaskia. In 1851, in pursuance of article 11 of the constitution of 1848, the legislature of this State passed an act entitled "An act to provide for the leasing of the lands granted as a common to the inhabitants of the town of Kaskaskia, in the county of Randolph, or so much of said lands as it may be to the interest of the inhabitants of said town to lease for school and other purposes." (Private Laws of 1851, p. 5.) This act contained a preamble and sixteen sections. The preamble reads as follows: "Whereas the inhabitants of Kaskaskia, in the county of Randolph, are in common entitled to the use and benefit of certain lands, commonly known as the Kaskaskia commons, by virtue of an ancient grant recognized and confirmed by the government of the United States; and whereas the right to lease said lands, or any part of them, is granted by the constitution of this State to a majority of the qualified voters therein, and they having petitioned therefor, therefore," etc.

Section 1 of the act provides that Denis Kavanaugh, Savinien St. Vrain, Joseph Baronowsky, George W. Staley and Edmund Menard, citizens of the town of Kaskaskia, are constituted a body corporate and politic, by the name and style of "The President and Trustees of the Commons of Kaskaskia," and that they and their successors should have perpetual succession and existence, with power to contract and be contracted with, and to sue and be sued, and to use a common seal, and to adopt ordinances

and by-laws, and to do and perform all other acts necessary to carry into existence said trust not inconsistent with the constitution of this State and of the United States.

Section 2 provides that said trustees should continue in office until the first Monday in April, 1853, and until their successors are elected and qualified, and that on that day there should be elected five trustees of the commons of Kaskaskia, who should hold their office for two years and until their successors were elected and qualified, and that said trustees should organize by the election of one of their number president and by the appointment of a treasurer, who should be *ex-officio* clerk of said trustees, and that not less than three of said trustees should constitute a quorum.

Section 3 provides that the president and trustees thus appointed are authorized and empowered to have the commons of Kaskaskia, or any part thereof, subdivided into such lots as in their opinion will seem best and most advantageous, and shall cause a plat or plats of the same to be made showing the number of acres in each lot and the location thereof, which plat or plats, when so made, shall be recorded in the recorder's office of Randolph county.

Section 4 provides that "the president and trustees shall then proceed to lease, at public outcry, at a suitable place in the town of Kaskaskia, any or all of the lots so surveyed, for any number of years, not exceeding fifty, as in their opinion will best promote the interests of the inhabitants of said town, and after giving notice for six consecutive weeks in a newspaper printed in the county of Randolph and such other papers as they may deem proper, and by putting up four written or printed notices in four of the most public places in said town, of the place where and the time when said lots will be publicly offered for lease."

Section 5 provides that "each lot shall be offered separately, stating the number of years for which it is proposed to be leased and the number of acres it contains, and the same shall be struck off to the best and most responsible

bidder bidding the highest amount of money per acre there-
for, payable annually each and every year the same is leased
for, at such time as may be designated and appointed by
the said president and trustees, an entry of which shall be
made by the clerk of the board in a suitable and substan-
tially bound book to be provided for that purpose, which
shall be subject to the inspection of any person interested.
And the said president and trustees of the commons of
Kaskaskia shall, by their said president, under his hand
and seal, make and execute to each lessee a deed of lease
for the number of years each lot or lots were bid off by
such lessee, which deed of lease shall vest in the purchaser,
his heirs and assigns, the full and complete possession and
use of such lot or lots for the term of years that they were
so leased, conditioned for the annual payment, at such time
in each year as may be designated by the said president
and trustees, of the amount bid by the lessee to the said
president and trustees and their successors in office, or to
such other person or persons as may be by them authorized
to receive the same, for the use and benefit of the inhab-
itants of Kaskaskia, to be applied to school and other pur-
poses."

Section 6 provides that "the proceeds of the lands and
lots of the said commons of Kaskaskia so leased as pro-
vided in this act shall, after defraying the expenses attend-
ing the leasing of said lands and lots, be used and applied
to the education of the children of the inhabitants of Kas-
kaskia and such residents as are by immemorial custom
commoners upon said commons, and the children of the
lessees of lots and lands so leased, to effect which object
and carry out the intention of this act the president and
trustees, or their successors in office, shall rent, or procure
or cause to be erected or purchased, as in their opinion
may be necessary, one or two suitable buildings for a
school or schools; and they are hereby authorized to pur-
chase and hold, in their corporate capacity, one or more

lots of ground in the town of Kaskaskia for that purpose, using therefor the proceeds arising from the leasing of the said lands and lots; and they may further use said proceeds for the purchasing of suitable school books and stationery and a library or libraries for such school or schools, and shall employ a teacher or teachers, qualified as required by the common school law of this State, for the instruction of the pupils in the said school or schools, in which reading, writing, arithmetic, grammar, geography and other branches of education may be taught, which teacher or teachers may be by them paid, according to such contracts and regulations as they may make and adopt, out of the proceeds arising from the leasing of said lands and lots. And the said president and trustees are hereby authorized and empowered to establish not more than two elementary schools in the town of Kaskaskia to carry out the provisions and requirements of this act."

Section 7 provides that "the president and trustees shall have power and are hereby authorized to appropriate a portion of the proceeds arising from the leasing of said commons to the purposes of religion and for the support and advancement thereof: *Provided,* that no appropriations shall be made under this section unless the same are asked for and desired by a majority of the voters of the said town of Kaskaskia by petition or petitions presented to the said president and trustees, indicating the religious purposes to which the same shall be applied and the amount thereof thus applied."

Section 8 provides that records of the proceedings of the said president and trustees and correct accounts of all moneys expended under their direction shall be kept and reports annually made to the inhabitants of the town of Kaskaskia.

Section 9 provides that in case of a vacancy in the office of trustee the same shall be filled by appointment by the remaining trustees.

243—17

Section 10 provides that "the said president and trustees, and their successors in office, shall have power to receive annually from the lessees of said lands and lots the moneys due annually upon all deeds of lease by them made, and shall transmit the same, should there be any in their hands, to their successors in office; and nothing in this act contained shall prevent the said president and trustees from leasing, at any time, any of the said lands and lots, after having first offered the same at public outcry."

Section 11 provides that the treasurer shall give bond, etc., and section 12, that there shall be appointed a superintendent of schools.

Section 13 provides that "no person shall be entitled to vote for trustees or be eligible to election unless he shall be a free white male citizen of this State of the age of twenty-one years or upwards, and shall have resided one year next preceding such election within the limits of Kaskaskia; and no person shall be eligible to the office of trustees of said commons unless he shall, moreover, be at the time of his election a resident freeholder of said town; and the president and trustees appointed by this act, and their successors in office, shall cause six written or printed notices to be posted up in six of the most public places in said town of Kaskaskia, at least four weeks preceding every election, announcing the time and the place when and where the election provided for by the second section of this act will be held, at which election two of said trustees will preside as judges; and said elections shall be held, as near as can be, in conformity to the Election law approved February 12, A. D. 1849, so far as it relates to the manner of voting and depositing ballots and counting and canvassing the votes: *Provided,* that said trustees so presiding as judges may open the polls at one o'clock P. M. and close them at six o'clock P. M., and a certificate of said judges stating who were elected as such trustees at any election so held shall be *prima facie* evidence of their election in the courts of this State."

Section 14 provides that the president and trustees shall, by suit or otherwise, have the power to protect said commons from trespassers, etc.; section 15, that the president and trustees shall have the power to loan any surplus funds in their hands, etc.; and section 16, that the president and trustees shall organize within thirty days after their appointment, and said act is to be considered as a public act.

The statute thus passed, and under the provisions of which the trustees of the commons of Kaskaskia should have been elected, clearly defines the duties of said trustees when elected, and is the instrument to which said trustees, the beneficiaries of said trust and the courts must look for the purpose of determining the powers and duties of said trustees, and to no other source.

It appears from the record that five subdivisions of the commons of Kaskaskia have been made by the president and trustees of the commons of Kaskaskia, namely: No. 1 in 1855; No. 2 in 1867; No. 3 in 1889; No. 4 in 1889; and No. 5 in 1900. The following plat shows all of said subdivisions:

The appellants, who were trustees of the commons of Kaskaskia, were elected by voters who resided in the village of Kaskaskia,—the voters on the island, residing outside of the village, being excluded from any voice in the selection of said trustees. As we have seen, the legal voters of the entire parish of the Immaculate Conception of Kaskaskia had the right to participate in the election of said trustees. We think it clear, therefore, that the said appellants, who are acting as trustees of the commons of Kaskaskia, were not legally elected trustees of the commons of Kaskaskia. The question then arises whether a court of chancery, in a proceeding like this, has the power to remove said trustees and order an election of their successors, at which election all of the legal voters of the island would have the right to vote.

It would seem clear that the trustees of the commons of Kaskaskia are not public officials but trustees, and that the trust created in the commons of Kaskaskia by the act of 1851, under which act the appellants, as trustees, are claiming to administer the affairs of the commons, is in the nature of a charitable trust, said trust being created to provide a fund from the rent arising from said commons to be used for educational and religious purposes; and it being made to appear to the court that the persons who are attempting to administer said trust were illegally elected, it would seem to be within the jurisdiction of a court of chancery, in the proper administration of said trust, to remove said trustees and to provide for the holding of an election by some officer to be appointed by the court, such as its master in chancery, at which each of the voters entitled to participate in the election of trustees of the commons of Kaskaskia might participate. If this cannot be done, then, by the usurpation practiced by the voters of the village of Kaskaskia, the large fund which should annually accrue from the rents of the commons of Kaskaskia might be diverted from its proper uses and be appro-

priated to purposes not contemplated by the statute or be entirely wasted or squandered by a body of men who were not legally the trustees of said commons. It also appears from the evidence found in this record that the trustees who have managed the commons of Kaskaskia since the passage of the act of 1851 have acted for and on behalf only of the inhabitants of the village of Kaskaskia, and have entirely ignored the rights of the inhabitants of the parish of the Immaculate Conception of Kaskaskia to participate as beneficiaries in the rents arising out of the leasing of the commons of Kaskaskia, and that in the leasing of said commons the trustees have in many instances been guilty of the grossest mismanagement and fraud; that instead of leasing the lands, (especially those included in survey No. 4 and the re-leasing of the lands included in No. 1,) at a public letting, in good faith, as required by the statute, the public letting degenerated into a farce, and at said lettings the leases upon said lands were bid up by pretended bidders, who were often non-residents, to an exorbitant price, and that the bidders, after the public letting had been adjourned, refused to accept the leases on said lands, and the lands thereafter were leased by the trustees at a private letting to their favorites or themselves, at a mere nominal rental, for a period of fifty years, and the leases, when executed and delivered by the trustees to such lessees, were immediately assigned by said lessees or the lands sub-let at a greatly increased rental from what said lessees had agreed to pay at such private lettings; and in one instance it appears that at the public letting the leases were bid up to fifty or a hundred-fold above their real value, and that as soon as the public letting had adjourned the trustees repaired to a private room, where they placed the number of each lot upon a card, with the amount at which they proposed to rent the lot per acre per annum for a period of fifty years, and placed those cards in one hat and then placed cards with the names of proposed lessees

thereon in another hat, and a card was drawn out from each hat at the same time, and the proposed lessee whose name was drawn from the hat which contained those names was given a lease upon the lot upon the card which was drawn from the other hat, and by this method lands were leased at ten cents per acre for which the trustees had in some instances been offered ·from *bona fide* lessees an annual rental for fifty years of from $2 to $2.50 per acre. The manner of leasing these lands, especially those located in survey No. 4 and the re-leasing of the lands located in survey No. 1, appears to have been honeycombed with fraud. It also appears that large sums of money collected by the trustees were paid out by them without any authority in law and that large sums of money collected by them as rent finally reached their own pockets. It would seem too plain for argument that some action should have therefore been taken in the lower court whereby the mismanagement of this large trust estate could have been checked and the lands known as the commons of Kaskaskia placed in the hands of trustees who would carry out in good faith the trust imposed upon the president and trustees of the commons of Kaskaskia by the terms of the act of 1851.

We are therefore of the opinion that the trial court erred in not removing said trustees, and in not directing an election to be held for the election of new trustees, and in not requiring the old trustees who were parties to this suit to account for all moneys which had come into their hands and which had been wrongfully paid out or misappropriated, and in not setting aside all leases of said commons which had been fraudulently and illegally made, and to this extent the decree of the lower court is erroneous.

We do not agree, however, with the contention of the appellees that subsequent to the adoption of the constitution of 1870 no part of the funds derived from the leasing of the commons of Kaskaskia can be used for religious

purposes, if the manner of appropriating the same to such use is in compliance with the provisions of the act of 1851. We think the provisions of section 3 of article 8 of the constitution of 1870 apply only to the funds belonging to public corporations, and are intended to prohibit the use, for sectarian or religious purposes, of funds which form a part of the public revenues of the State.

The decree of the circuit court will be affirmed so far as its correctness is challenged by the assignments of error made by the appellants but will be reversed upon the first, second, third and fourth cross-assignments of error by the appellees, and the case will be remanded to the circuit court for further proceedings in accordance with the views herein expressed, with leave to the complainants to amend the information and to make new parties, so far as it may be deemed necessary to bring before the court all persons whose interests may be affected by any decree which may be hereafter entered by the trial court.

*Affirmed in part and reversed in part and remanded.*