THE LAND COMMISSIONERS OF THE COMMONS OF KASKAS-
KIA *et al.* Plaintiffs in Error, *vs.* THE PRESIDENT AND
TRUSTEES OF THE COMMONS OF KASKASKIA *et al.* De-
fendants in Error.

*Opinion filed April 19, 1911.*

1. COMMONS OF KASKASKIA—*power to authorize sale of lands
is in the State, only.* The title to the commons of Kaskaskia is
in the inhabitants of the Parish of the Immaculate Conception of
Kaskaskia, in trust for the use of the inhabitants, but the power
to authorize a sale of the lands rests in the State. (*Stead* v. *Com-
mons of Kaskaskia,* 243 Ill. 239, followed.)

2. SAME—*management of the common property is determined
by the majority.* All authoritative acts in the management of the
commons of Kaskaskia must be sanctioned by the will of the ma-
jority, but it is immaterial whether such will be manifested by
ballot or petition, as both methods are appropriate and one is as
effective as the other.

3. SAME—*petition of the majority is binding upon the minority.*
A petition by the majority of the inhabitants of the island of Kas-
kaskia, addressed to the legislature and asking for the enactment
of a certain law relating to the management of the common prop-
erty, is an assent binding upon all other inhabitants, whether the
policy of the law requested is wise or unwise.

4. SAME—*interest of inhabitant depends upon his being a mem-
ber of the community.* Each inhabitant of the island of Kaskaskia
has the right to enjoy, in common with the other inhabitants, the
common property so long as he remains a member of the com-
munity, but he cannot sell his right nor does it descend to his
heirs, and if he removes from the community his right is lost.

5. SAME—*effect of act of 1909, authorizing sale of commons of
Kaskaskia.* The only effect of the act of 1909, (Laws of 1909,
p. 425,) authorizing the sale of the commons of Kaskaskia, so far
as the common property is concerned, is to provide for the conver-
sion of land into securities, leaving unaffected the right of each
inhabitant to the benefit of the income of the securities for the
support of the schools, to the same extent it was enjoyed before
the act was passed.

6. CONSTITUTIONAL LAW—*act of 1909, authorizing sale of com-
mons of Kaskaskia, is valid.* The act of 1909, (Laws of 1909,
p. 425,) authorizing the Governor to appoint commissioners to sell
the commons of Kaskaskia for the purpose of raising a fund, the

income of which is to be used for the support of the schools of the island, is not invalid upon the ground that it deprives the inhabitants of their property without due process of law.

7. SAME—*constitution does not prohibit all special legislation concerning schools.*  The provision of section 22 of article 4 of the constitution, that no special or local law shall be passed providing for the management of schools, is expressly restricted to the subject of the management of common schools and has no reference to a law passed for the support or establishment of schools.

8. SAME—*the act of 1909, authorizing sale of the commons of Kaskaskia, is not invalid as prohibited special legislation.*  The act of 1909, (Laws of 1909, p. 425,) authorizing the sale of the commons of Kaskaskia and the investment of the proceeds in interest-bearing securities, the income of which is to be used for the schools of the island of Kaskaskia, is not invalid as a special law providing for the management of schools, within the meaning of section 22 of article 4 of the constitution.

WRIT OF ERROR to the Circuit Court of Randolph county; the Hon. GEORGE A. CROW, Judge, presiding.

W. H. STEAD, Attorney General, (EMERY ANDREWS, of counsel,) for plaintiffs in error.

JAMES H. MARTIN, A. E. CRISLER, and H. C. HORNER, for defendants in error.

Mr. CHIEF JUSTICE VICKERS delivered the opinion of the court:

Certain of the lessees of the commons of Kaskaskia filed a bill in equity against the trustees of said commons for the purpose of enjoining said trustees from collecting the rents for the year 1909.  In June, 1909, the legislature passed an act entitled "An act to provide for the sale of the Kaskaskia commons upon the island of Kaskaskia, in the county of Randolph, and to create a permanent school fund for the inhabitants of said island out of the proceeds of said sale, and to punish any person failing to comply with the provisions thereof."  Said act authorized the Gov-

ernor to appoint three commissioners, to be known as the "Land Commissioners of the Commons of Kaskaskia," and defined the powers of said commissioners in respect to the sale and final disposition of the commons of Kaskaskia. Under that act the Governor afterwards appointed W. R. Hunter, C. A. Davidson and H. H. Kohn as such commissioners. After their appointment the commissioners came in and upon their motion they were made parties complainant in the bill then pending against the president and trustees of the commons. The bill was thereafter amended, and the defendants filed both a general and special demurrer thereto. The circuit court sustained the demurrer and dismissed the bill for want of equity. The complainants below have sued out a writ of error from this court to obtain a review of the decree sustaining the demurrer and dismissing their bill. The only question involved is the constitutionality of the act of 1909.

A brief statement of the situation in relation to the Kaskaskia commons at the time of the passage of the act of 1909, and prior thereto, is necessary to a correct understanding of the several provisions of the act. A very complete and exhaustive statement of the history of the Kaskaskia commons will be found in the cases of *Trustees of Commons* v. *McClure,* 167 Ill. 23, and *Stead* v. *Commons of Kaskaskia,* 243 id. 239. Only so much of the history will be recapitulated here as seems to be necessary to a proper understanding of the questions presented by the record in this case.

The title of these commons was originally in the king of France. On September 14, 1722, Louis XIV, king of France, made a grant of Kaskaskia commons to the inhabitants of the Parish of the Immaculate Conception of Kaskaskia, in the territory of Illinois. No written evidence of the original grant has been found, but the existence of the grant is well authenticated by the order of confirmation issued by the Governor and Commissary Orderer

of the Province of Louisiana in the year 1743, which is of
record in the State Auditor's office at Springfield, and other
official documents not necessary to be here referred to.
This grant has been confirmed to the settlers of Kaskaskia
by all of the governments that have had possession of that
territory, including the United States, until the organiza-
tion of the State of Illinois, in 1818.    The constitution
of 1818 confirmed the title to all commons theretofore
granted, with certain exceptions not necessary to be stated.
The State of Illinois, by its legislature, passed an act in
1818 authorizing the trustees of the town of Kaskaskia to
make by-laws, rules and ordinances for the regulation of
the Kaskaskia commons.    The constitution of 1848 again
recognized the right of commons, and provided that upon
a petition of a majority of the qualified voters interested
in any such commons they might be divided, leased or
granted in such manner as might thereafter be provided by
law.    Under the constitution of 1848 a law was passed
January 23, 1851, providing for the selection of a president
and board of trustees of the commons of Kaskaskia, with
perpetual succession and existence, with power to sue and
be sued, who were authorized by the said act of 1851 to
have entire control of the commons of Kaskaskia, with full
power to lease said commons, or any part thereof, for a
term not exceeding fifty years.

The case of *Stead* v. *Commons of Kaskaskia, supra,* in-
volved, among other things, the mismanagement and fraud
of the president and board of trustees who assumed to act
under the law of 1851.    In that case the several provisions
of the law of 1851 were set out and considered.    It is not
necessary that we should again repeat what was there said
in respect to that legislation.    It will be sufficient for our
present purposes to say that the general result of the de-
cision of this court in that case was a finding that the
president and board of trustees had been guilty of gross
fraud and mismanagement in the administration of the af-

fairs of their trust, and the judgment below was reversed
for the reason, among others, that the court below had re-
fused to remove the president and board of trustees from
office and order an election for a new board. A reference
to the opinion of this court in the case last above cited will
disclose that the affairs of the commons had been for many
years so manipulated by the trustees as to deprive the bene-
ficiaries of the trust of a large part of the funds that were
realized, or should have been realized, out of the leasing
of the commons, and in such manner as to wrongfully and
illegally result in large profits to the trustees. In view of
the unsatisfactory condition of affairs which was developed
in the case last above cited, but before this court had handed
down its decision, a majority of the legal voters interested
in the commons petitioned the legislature to pass an act
authorizing the sale of the common property for the pur-
pose of creating a permanent common school fund for the
benefit of the inhabitants of said island. In pursuance of
said petition and in accordance with the request therein
made the act in question was passed by the legislature of
1909. The preamble of said act is as follows:

"Whereas, the inhabitants of the island of Kaskaskia,
in the county of Randolph, are in common entitled to the
use and benefit of certain lands commonly known as the
Kaskaskia commons, consisting of about 6500 acres, by vir-
tue of an ancient grant recognized and confirmed by the
government of the United States and the State of Illinois;
and whereas, the right to sell or lease said lands, or any
part thereof, was granted by the constitution of Illinois of
1848 to a majority of the qualified voters therein; and
whereas, pursuant to said right, a majority of the qualified
voters of Kaskaskia did petition the General Assembly of
Illinois for permission to lease said lands, whereupon the
General Assembly of Illinois passed an act, which was ap-
proved January 23, 1851, granting said privilege for school
and other purposes as therein specified; and whereas, the

said lands, pursuant to said act of 1851, have been leased in separate subdivisions at different times for a period of fifty years; and whereas, it appears, from a .petition now presented to the General Assembly of Illinois by a majority of the legal voters of said island, that a large portion of the funds secured by the said leasing, and intended for school purposes, have been misused and misappropriated by the trustees entrusted with the care thereof; and whereas, it also appears from said petition that the school system provided by the act of 1851 for the said island is now wholly inadequate and inefficient for the inhabitants of said island and that the common schools of said island are in need of said funds; and whereas, there is no general law in this State, nor can one be enacted, applicable to the case because there is no other such a grant of commons within the State nor any other community so situated; therefore," (the body of the act then follows.)

Section 1 of said act provides for the appointment by the Governor of three commissioners, not more than two of whom shall be from the same political party, to be known by the name and style of "Land Commissioners of the Commons of Kaskaskia," and empowers them to sue and be sued, and to do all other acts necessary for the proper exercise of the powers conferred until the object and purposes of the act are completed and carried out as therein directed.

Section 2 provides for the filling of vacancies, and section 3 provides that said land commissioners shall proceed to take possession of all books, papers, vouchers, leases, contracts, deeds, property, (real or personal,) and all other papers or property belonging to or in any way pertaining to the commons of Kaskaskia, and directs that the president and trustees of the commons of Kaskaskia, and all other officers or persons having possession or control of any of the property belonging to said commons, may be sued in any appropriate action for the recovery of any and

all of such common funds or property that may be in their hands belonging to the commons, and provides a penalty for a refusal of any such person to comply with the request of said land commissioners for the delivery to them of the property or funds of such commons.

Section 4 provides for the re-survey of the commons and· for the ascertainment of the exact number of acres in each of the lots, and for the making of a plat designating the lands in cultivation, the low lands, the timber lands, etc., so as to give full information and understanding of the "location, character and value of said lands."

Section 5 provides that as soon as the said lands have been surveyed and platted, as provided in section 4, said commissioners shall fairly appraise said lands, and directs that they shall go upon the same and may swear and examine witnesses so as to be able to appraise each lot at its fair cash value, and provides for a certified copy of a report of such appraisement, together with a blue-print copy of the plat, to be filed with the Auditor of State, where the same shall be kept among the files and records of his office. Said report of the appraisers shall also contain a list of the lessees of said lands, together with their post-office addresses and a brief description of the leases under which they hold.

Section 6 provides that after the appraisement the land commissioners shall give the lessees and occupants of the several lots who hold valid leases upon the same, a written notice to the effect that such lessees may, within sixty days from the date of said notice, purchase the lot or lots upon which they have such leases, upon the lessees presenting to the commissioners sufficient evidence of their good title as such lessees, which purchases may be made by said lessees at the appraised value placed upon said lands by the appraisers, exclusive of improvements, one-fourth of the purchase price to be paid in cash and the other three-fourths to be paid in three equal payments of three, six and ten

years from the date of such purchase, the deferred payments to bear interest at the rate of five per cent and to be secured by a first mortgage upon the premises sold, and that said commissioners shall, as soon as their work is completed, make and file a final report with the State Auditor.

Section 7 provides for the sale of all of such lots at public vendue, to the highest and best bidder, as shall not have been purchased by the lessees, which said sales shall be upon the same terms as is provided in section 6 for sales to the lessees. No lot shall be sold that does not bring at least two-thirds of the appraised value, including improvements; and if any of said lots fail to bring the required price at such public sale, the commissioners are authorized to postpone the sale of such lot or lots until such time as they may be able, either by public or private sale, to secure at least two-thirds of the appraised value thereof. Said section also provides that if by reason of changed conditions it shall be found impossible, after repeated efforts, to sell at two-thirds of the appraised value, such lands may be re-appraised and sold for two-thirds of the value as fixed by such re-appraisement. Each lot is to be sold separately, unless it is found that by putting two or more together a better price can be obtained.

Section 8 authorizes the land commissioners to collect all rents that may fall due before said lands are finally disposed of, and to lease, for a period not exceeding one year, such lands as are not already leased, and provides that all sales made by the commissioners to persons other than the lessees shall be made subject to any valid leases that may be upon the lands.

Section 9 provides for the execution of deeds to the purchasers by the commissioners when the terms of the sales have been complied with, and for the approval of such deeds by the Governor, and the taking of notes and mortgages for deferred payments in the name of the People of the State of Illinois, for the use of the inhabitants

of the island of Kaskaskia, and provides that said commissioners shall receive all payments until they have made their final report, and thereafter all payments to be made to the State Auditor, who shall receive the money, cancel notes and turn the funds over to the State Treasurer.

Section 10 relates to the retention of school buildings that may be upon said lands.

Section 11 provides for the keeping of a record book by the land commissioners of all of their doings and sales, showing, in detail, all of their official transactions, which record, when completed, shall be turned over to the State Auditor and remain as one of the files of record of his office.

Section 12 provides for the making of a full and final report by said commissioners as soon as all of the lands have been sold, giving in detail the amount of money, notes and mortgages received by them and the amount expended, by items, which report shall be made to the Governor, and the said commissioners shall turn over all moneys in their hands belonging to said fund to the Treasurer of the State, who shall keep the same in a separate fund, designated as the "Kaskaskia Commons Permanent School Fund," and that all notes and mortgages shall be turned over to the State Auditor, and if, upon examination of such report by the State Auditor and the Governor, the same is found correct and that the provisions of the act have been carried out, the Governor shall approve said report and the State Treasurer shall receipt them for the funds, securities and records, and they shall be fully and finally discharged from any further duties or liabilities.

Sections 13 and 14 relate to the investment of the principal of the said funds and the use of the interest for the support of the schools upon the island of Kaskaskia. The State Treasurer and Auditor are required to keep the principal of said funds invested in good interest-bearing school, municipal, county or State bonds or first mortgages on real

estate which shall yield at least five per cent interest, said investments to be made by the State Treasurer by and with the approval of the State Auditor, who shall be the keeper of said securities and keep an accurate record thereof, and the income derived therefrom shall be paid out by the State Treasurer upon warrants issued by the State Auditor for the support of the schools upon the island. The warrants shall be issued by the Auditor upon certified, itemized bills to be sent to him from time to time by the president and secretary of the school directors or boards of education of said island of Kaskaskia, and said money shall only be paid for teachers' wages, repairs to school buildings and grounds, fuel, necessary apparatus for schools, school library, and school books for children who are unable to buy them, and such incidental expenses as may be necessary for the support and maintenance of said schools, to be determined by the boards of education or directors by resolutions adopted by them, a certified copy of which shall be filed with the Auditor before any vouchers are issued for bills. It is further provided that the State Auditor shall each year apportion the income from said common fund among the various districts upon the said island in the same manner that is now provided by law for the apportionment of State school funds, and notify the directors or boards of education of the several districts' on the island of the amounts so apportioned to them and place the same to their credit, and that said school authorities shall not be allowed to draw upon the principal of said fund or to anticipate any of the income therefrom, but shall only be entitled to have their requisitions honored for the amount of the interest placed to their credit.

Section 15 requires that each of the commissioners shall enter into a bond in the sum of $30,000, to be approved by the Governor, and take and subscribe to an oath to be filed with the Governor to faithfully discharge the duties required of him, and provides that the compensation of the

commissioners shall be six per cent of the net amount of cash and mortgages realized from the sale of lands and rents and other funds they may collect, not including interest, and authorizing the employment by the commissioners of such surveyors, clerks and appraisers as may be necessary to carry out the objects of the act, at an expense not exceeding five dollars per day for each man actually employed.

Section 16 provides that if it becomes necessary for said commissioners to bring or defend any suit, at law or in equity, in any court in order to carry out the objects and purposes of the act, the Attorney General shall furnish them with such legal counsel or assistance as they shall need from time to time, and section 17 repeals the act of January 23, 1851.

The constitutionality of the foregoing act is challenged on the ground that it deprives inhabitants of the Parish of the Immaculate Conception of Kaskaskia of property without due process of law, in violation both of the State and Federal constitutions, and on the further ground that the act is special legislation in regard to the management of common schools, which is forbidden by section 22 of article 4 of the constitution of 1870.

Appellees' position in regard to the first contention may be stated as follows: The title to the Kaskaskia commons is not now, nor ever was, in the State of Illinois, but the same has been always, and still is, in the inhabitants of the Parish of the Immaculate Conception of Kaskaskia, as a body and not as individuals, in trust for the use of the inhabitants of said parish. The title being thus assumed to be in the inhabitants of the parish as a community of individuals, for their common use, the General Assembly of the State has no power to divest the title of the inhabitants and cause the same to be invested in some one else; that the act of 1909, which purports to authorize commissioners appointed by the Governor to sell these commons and

convey the title, will deprive the owners of their property without due process of law. The appellees concede that it would be within the constitutional power of the legislature to pass an enabling act under which the inhabitants might sell and dispose of these lands, but it is contended that a sale made by persons appointed as provided in the act of 1909 is an unlawful deprivation of property without due process of law.

This court, in the case of *Stead* v. *Commons of Kaskaskia, supra,* on page 250, said: "We think it obvious, therefore, that the legal title to said commons vested in the inhabitants of the Parish of the Immaculate Conception of Kaskaskia for the use of the inhabitants of said parish,"—citing *Haps* v. *Hewitt,* 97 Ill. 498, *Rutz* v. *Kehn,* 143 id. 558, and *Trustees of Commons* v. *McClure,* 167 id. 23.

Conceding that, subject to certain infirmities growing out of the peculiar character of the property and the situation of the holders of the title thereof, the legal title to said commons was in the inhabitants of the parish, the question is directly presented whether the act of 1909, which provides a scheme by which the common property is to be converted into a permanent school fund for the use of the inhabitants of the island, is open to the constitutional objection urged against it. The title which this court held to be in the inhabitants of the parish is subject to certain restrictions and limitations that do not exist in reference to an ownership in fee by an individual in his own right. It is conceded on all hands, and has been held by this court, that there was no power residing anywhere, except in the State itself, to authorize a segregation of these lands or their diversion to any use different from that provided for in the grant, or their conveyance *en masse* or in separate parcels, either in fee or for years, without legislative authority. In *Stead* v. *Commons of Kaskaskia, supra,* on page 252, this court said: "Until, therefore, the legislature

of this State shall provide for the sale of the commons of Kaskaskia, the title to those lands must be held to be in the artificial body where it was placed by the original French grant,"—citing *Doe* v. *Hill,* Breese, 304; *Hebert* v. *Lavalle,* 27 Ill. 448; *Lavalle* v. *Strobel,* 89 id. 370; *Haps* v. *Hewitt, supra; Rutz* v. *Kchn, supra; Trustees of Commons* v. *McClure, supra.*

The quotation just made is in accordance with all óf the previous holdings of this court, and is a recognition of the immemorial custom that has always been followed by the inhabitants of this parish when it was desired to make any lease or other contract giving an individual any exclusive rights in any portion of the common property. The act of 1851 was passed to provide the necessary means by which these lands could be leased. That act was passed, as was the act of 1909, in response to a petition signed by the majority of the inhabitants. It provided for the election of a president and a board of trustees, and conferred power upon them to survey and segregate and lease these lands for a period not exceeding fifty years. The act of 1851 remained in force until repealed by the act of 1909, and its constitutionality has never been questioned. The act of 1851 differs from the act of 1909 in two particulars. Under the act of 1851 the agents of the community who were to act for the body of the inhabitants were to be selected by vote and they did not have the power to sell the property outright. Under the act of 1909 the agents who are to exercise the powers of the body are to be appointed by the Governor and they are clothed with the power to sell the lands and convey the title thereto in fee. If it be conceded, as we understand it is from appellees' brief, that the act in question would be valid if it had provided, like the act of 1851, for the selection of the commissioners by an election of the inhabitants, the question involved is reduced to the single inquiry whether the provision authorizing the Governor to appoint the commissioners, thus taking the

matter entirely out of the hands of the inhabitants of the parish, renders the act unconstitutional and void.

There is no room to doubt that the legislature of the State has the constitutional power to pass a law authorizing the segregation and sale of community property. This power has always resided in the legislative department of the States in which commons or community property was located, and the power has been exercised by the legislature in this State by numerous acts under which commons have been disposed of. Thus, by the act of January 6, 1818, the legislature provided that the inhabitants of Cahokia might choose three fit persons, by vote, as trustees of the commons, who should have the power to do all business necessary to the right management of the commons; and by act of January 4, 1827, it was provided that the supervisor of Cahokia commons might cause the same to be surveyed into lots and lease the same for any number of years, not exceeding one hundred, the proceeds to be used for the education of the children of the inhabitants; and by another act, passed in 1874, it was provided that the supervisor was authorized to sell and convey the absolute title to the leasehold property when authorized to do so by three-fourths vote at an election to be held in the village. There are many other acts which might be referred to showing that the legislature of this State has always assumed and exercised the legislative control to enable the owners of commons to dispose of them in any lawful manner that was desired, for the benefit of the community entitled to the enjoyment of such property.

It seems to be assumed by appellees that if the act in question had provided for the election of the land commissioners by the legal voters of the parish the right to vote for such commissioners would in some way have saved the act from the constitutional objections urged against it. It would seem from this argument that the right, if any, of which the inhabitants of the parish have been deprived

is the right to select by ballot the agents who are to carry out the provisions of the law. If the legislature has the power to authorize the creation of a board by a vote of the majority of the inhabitants of the parish, with power to convey the lands, it is difficult to see why the legislature may not properly authorize the appointment by the Governor of a similar board for the same purpose. It is a well recognized principle of the law relating to the management of common property, that all authoritative acts shall be sanctioned, either directly or indirectly, by the will of the majority. It is immaterial whether this will is expressed by ballot or by petition, as was done when the majority of the legal voters of the island petitioned the legislature to pass the act in question. Both methods are appropriate means for expressing the wishes of the majority of those who are the beneficiaries of the property, and the one is as effective as the other. It is historically true that in the past the inhabitants of this island have always resorted to a petition to the legislature in order to obtain such legislation as was desired.

But there is another view which seems to us to be a complete answer to the objection to the law of 1909 now under consideration. For approximately sixty years these commons have been leased by the president and trustees under the act of 1851 and the proceeds have been used for educational purposes. Prior to that time the commons were largely devoted to pasturage for the domestic animals of the inhabitants. After the commons ceased to be profitable for grazing purposes and it was sought to appropriate them to some other use which might be enjoyed in common by all of the inhabitants, they have been devoted to general school and educational purposes. The act of 1909, while it provides for a conversion of the common property into interest-bearing securities, does not deprive the inhabitants of the island of the property or divert it to any different use than that to which it has been applied ever since the

law of 1851 was passed. The beneficial title in the permanent school fund that will be created under the act of 1909 will remain in the inhabitants of the parish and not in the State of Illinois, as seems to be supposed by the appellees. We have nothing to do with the political question whether it is wise to sell these lands and use the interest instead of the rents from the land. That is a question to be determined by the will of the majority of the inhabitants. In view of the great loss that has been sustained in the past through fraud and mismanagement under the leasing system, it is not surprising that the majority of the inhabitants should favor a sale of the common property and the investment of the proceeds in good interest-bearing securities under the control of responsible State officials.

Another consideration which, no doubt, had some influence in bringing about the decision to sell these lands is the probability that when the lands are sold and become the property of individuals the property will be improved and developed and enhanced in value, thus promoting the general prosperity of the island and lightening the burdens of taxation by increasing the value of the taxable property. But, as already suggested, it is not necessary that we should agree with the majority as to the general policy of the course being pursued. The petition of the majority to the legislature to pass this act is an assent binding on all the inhabitants of the island, and whether the course is wise or unwise need not be discussed. Each inhabitant has the right to enjoy, in common with the other inhabitants, the common property so long as he sees proper to remain a member of the community. He cannot sell this right to another nor will it pass by descent to his heirs. If he removes from the community and loses his citizenship his personal right immediately becomes extinct. If one becomes a citizen of the island he thereby acquires the right to enjoy the common property. Clearly, the individual members of this community are not deprived of any

property right by the act under consideration. The only effect of this act, so far as the common property is concerned, is to provide for a conversion of the property into securities, leaving the right of each inhabitant to enjoy the proceeds of this fund in the same manner and to the same extent that he has heretofore enjoyed the income from the land. There is therefore no ground for the contention that the act in question deprives the inhabitants of the island, as a whole, of their common property without due process of law, and no basis for the contention that any individual member of the community is deprived of his right or privilege in the common fund while others are permitted to enjoy the same.

Our conclusion is that the act of 1909 is not unconstitutional because it deprives the inhabitants of the island of their property without due process of law.

The next contention is, that the law is invalid because it is special legislation and in violation of section 22 of article 4 of the constitution of 1870, which provides, *inter alia,* that "the General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say: For  *  *  *  providing for the management of common schools." It will be observed that the constitutional inhibition is directed against special or local laws providing for the *management* of common schools and has no reference to a law passed for the support or establishment of schools. Section 1 of article 8 of the constitution provides that "the General Assembly shall provide a thorough and efficient system of free schools, whereby all children of this State may receive a good common school education." Section 2 of the same article provides that all moneys and property donated or received for schools, and proceeds thereof, shall be faithfully applied to the objects for which such gifts or grants were made. The clause above quoted which forbids the passage of a local or special law for the management of public schools is more re-

stricted than the language found in sections 1 and 2 of article 8. If it had been intended by the framers of our constitution to prohibit all special legislation respecting the public schools, language sufficiently comprehensive for that purpose would doubtless have been employed. Section 2 of article 8 clearly indicates that the constitutional convention contemplated that there might be trust funds donated or received for the support of public schools, hence the provision that all such funds donated or received should be faithfully applied to the purposes for which they are received. A law providing for the investment and care of such a fund is in no proper sense a law relating to the management of the school.

The provision of the constitution which forbids the passage of any special or local law relating to the management of public schools has received the consideration of this court in the case of *Speight* v. *People*, 87 Ill. 595. On page 601 of the opinion in that case it is said: "But section 22, article 4, of the constitution, prohibits the General Assembly from passing any local or special law providing for the management of common schools, and it is thought this must prevent the levying of taxes for school purposes, and the custody of the funds when the taxes are collected, by different officers in the city than those discharging these duties in other localities. It must be noticed that the language of this clause is much less comprehensive than that of article 8, section 1. There a *system* of free schools,— not merely the *management* of free schools,—is required to be provided, and had it been intended no local or special law should be enacted for that purpose it is most natural and probable that it would have been so said. If, however, we shall assume that was not the proper place for a restrictive clause, then why not say in article 4, section 22, 'the General Assembly shall pass no local or special law in relation to common schools,' if this was intended? This could have left no doubt and is the plainest and most usual

way of expressing such an idea. We must assume that the word 'management' was not unadvisedly or accidentally used, and that it relates to the conduct of the school in imparting instruction. To establish a school and provide the necessary funds for its support is one thing; its management or conduct, when established and supported, another and quite different thing."

These are the only constitutional objections urged against the validity of the law of 1909, neither of which seems to us to be tenable.

The decree of the circuit court of Randolph county sustaining the demurrer and dismissing the bill is reversed and the cause remanded to that court, with directions to overrule the demurrer, and for further proceedings in accordance with the views herein expressed.

*Reversed and remanded, with directions.*